UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                    **MEMORANDUM AND ORDER**

    v.                                                03-CR-929 (NGG)
                                                    05-CR-060 (NGG)

VINCENT BASCIANO,

                Defendant.
------------------------------------------------------X

GARAUFIS, United States District Judge.

On September 10, 2007, Defendant Vincent Basciano's ("Basciano" or "Defendant") attorneys brought to the court's attention allegations that cooperating witness ("CW") Dominick Cicale ("Cicale") tried to frame Defendant Vincent Basciano in a "bogus" prison murder plot. Since the allegations came to light, the parties have informed the court that three CWs in unrelated matters know, or may know, information about the Cicale allegations. On November 13, 2007, the Government filed under seal a motion for a protective order prohibiting the dissemination of the identity and location of one cooperating witness, identified as CW-1, to anyone other than the defense team. The Government also asked that it be permitted to redact the name of a separate inmate, identified as CW-2, and the identifying initials of a third inmate, identified as CW-3, as referenced in affidavits the Government submitted <u>ex parte</u>. On November 19, 2007, Basciano opposed the motion. The Government submitted a brief in further support on December 5, 2007, and Basciano replied on December 13, 2007. For the reasons set forth below, the Government's motion for a protective order is GRANTED.

1

## I. Background[1]

On August 13, 2007, Marco Santomaggio ("Santomaggio"), a Metropolitan Correctional Center ("MCC") prison guard, informed Basciano's attorneys that Cicale had propositioned CW-1, a cooperating witness in a separate matter, to claim falsely that Basciano had asked CW-1 to kill Cicale on Basciano's behalf. On August 17, 2007, CW-1 relayed the allegation to an assistant United States attorney. (Government' Motion for Protective Order ("Govt's Br.") at 1-2), and on September 10, 2007, Basciano's attorneys submitted an affidavit to the court from Santomaggio.

Santomaggio attested that on July 31, 2007, Supervisory Officer Regina Eldridge had advised him that Cicale had propositioned inmate WI-1 "in a bogus murder solicitation plot that allegedly involved Vincent Basciano and myself." (Santomaggio Aff. ¶ 2.) According to Santomaggio, Eldridge told him that WI-1 had informed her of the matter and that Eldridge "took it to the people who needed to know about it," including the MCC's Security Investigative Services. (Id.) Further, another inmate, WI-2, informed Santomaggio that Cicale had solicited fellow inmates to claim that Santomaggio was involved in the murder plot. (Id. at ¶ 3.)

The affidavits attached to the Government's motion are compelled statements of MCC personnel obtained by the Office of Internal Affairs of the Federal Bureau of Prisons ("OIA") in the course of an investigation into alleged "inattention to duty" by MCC staff with respect to the

---

[1] The following background facts involving the basic Cicale allegations, including the information contained in the Santomaggio Affidavit, have been previously unsealed by this court and place upon the public docket. (See October 15, 2007 Order in Case No. 50-Cr-060 (Docket Entry #326).)

Cicale allegations. (Govt's Br. at 4.) The affidavits refer to CW-1 by name and reference by name or initials CWs 2 and 3, who were also witness-security inmates housed in Protective Unit Custody at the MCC at the time of the alleged plot. (Id. at 5.) The affidavits show that one MCC staff member first became aware of the Cicale allegations in June 2007 and reported them to two supervisors the next day. The incident purportedly was not investigated until August 15, 2007, at which time the BOP referred the matter to the OIA for investigation, which in turn referred the matter back to the BOP for internal investigation.

In support of its motion, the Government states that it will disclose the name of CW-1 to the defense but seeks a protective order prohibiting dissemination of CW-1's identity beyond Defendant's defense team. (Id. at 6.) The Government argues that dissemination of CW's identity could subject him to danger as a cooperating witness. (Id. at 6-10.) In addition, the Government argues that neither CW-2 nor CW-3 is relevant to Basciano's pending request for an evidentiary hearing because neither inmate is described in affidavits as having personal knowledge of the truth or falsity of the allegation against Cicale or of whether MCC staff members' knowledge of the allegations may be imputed to the prosecution. Thus, the Government argues, information regarding CWs 2 and 3 does not fall within the Government's discovery obligations. (Id. at 10.)

Basciano does not oppose a protective order that would limit dissemination of the CWs' identities to Defendant and his defense team, including attorneys, investigators, and paralegals. (Defendant's Memorandum in Opposition to the Government's Proposed Protective Order ("Def's Br.") at 1.) He objects, however, to the Government's desire to keep the identities of CW-2 and CW-3 hidden and to the silence of the proposed protective order "regarding Basciano

3

counsel's right to interview these "CW's." (Id.) Basciano argues that the evidence at issue is relevant both to whether the Government violated its Brady obligations in Case No. 03-CR-929 during Basciano's retrial in July of 2007 and for impeachment purposes in Case No. 05-CR-060, which is scheduled for jury selection in the summer of 2008 and in which Basciano faces the death penalty. (Id. at 9.) According to defense counsel, they face "heightened obligations" in a death penalty case to insure a thorough investigation of such allegations. (Id. at 5.)

The Government's rejoinder is that any heightened investigatory obligations on defense counsel in a capital case do not entail heightened discovery obligations on the Government to disclose material that is not otherwise required under Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972) and their progeny. (Government's Reply Memorandum in Support of Its Motion for a Protective Order ("Gov't's Reply Br.") at 4-6.) Specifically, the Government argues that Basciano has offered no legal basis for an Order requiring the CWs to submit to interviews with his attorneys. (Id. at 3.) Furthermore, the Government argues that its discovery obligations do not require disclosure of cumulative impeachment material and that, in any event, Basciano has knowledge of the allegation and will be provided with the identity of CW-1 and his attorney after the court rules on the instant motion. (Id. at 8-9.)

Finally, Basciano responds that a hearing at which certain MCC personnel and inmates testify "is the only way to establish who had knowledge and who shared this knowledge with the prosecution team." (Reply Memorandum in Opposition to the Government's Motion for a Protective Order ("Def's Reply Br.") at 7.) Basciano argues that the Government has failed to come forward with any evidence obtained by the FBI or U.S. Attorney's Office in an

4

investigation of the incident and that, without "judicial intervention," the prosecution will do everything in its power to dissuade CW-1 and others from submitting to interviews with Basciano's lawyers. (Id. at 8-10.) Finally, Basciano argues that it is a reasonable inference, based on what the Government has disclosed about the contents of the ex parte affidavits, that CW-2 and CW-3 may have information relevant to the Cicale allegations. (Id. at 11-12.) At a minimum, Basciano contends, the court should reserve decision on the motion and order the Government to provide the affidavits to the defense without the identifying information (id. at 12), but he urges the court to issue a protective order that allows the defense team to learn the identities of CW-1, CW-2, CW-3, WI-1, and WI-2, and to interview those inmates. (Id. at 16.)

## II. Discussion

The Government's motion and Basciano's responses raise two distinct issues: (1) whether this court should order the Government to disclose the identities of the CWs to the defense and to provide Basciano's lawyers the opportunity to interview them, and (2) the extent to which the court, assuming that the defense is given at least the identity of CW-1, should prohibit dissemination of that information outside the defense team. The court will address each issue in turn.

"Brady and its progeny require the Government to disclose material information that is favorable to the accused, either because it is exculpatory, or because it is impeaching." United States v. Rodriguez, 496 F.3d 221, 225 (2d Cir. 2007) (citation and internal quotation marks omitted); see also, United States v. Madori, 419 F.3d 159, 169 (2d Cir. 2005) ("The government's duty to disclose is not limited to "exculpatory" information, it also includes information that could be used to impeach government witnesses, so-called Giglio material.")

5

This obligation "recognizes the possibility that the evidence on which the prosecution relies to prove the defendant's guilt is not necessarily truthful, accurate, or complete, especially when the prosecution's investigations have made it aware of evidence or information that might be favorable to the defense in controverting the Government's proofs." Id. Brady information must be disclosed "in a manner that gives the defendant a reasonable opportunity either to use the evidence in the trial or to use the information to obtain evidence for use in the trial," which requires the Government to make disclosures "in sufficient time that the defendant will have a reasonable opportunity to act upon the information efficaciously." Id. at 226; see also, Leka v. Portuondo, 257 F.3d 89, 103 (2d Cir. 2001) ("The opportunity for use under Brady is the opportunity for a responsible lawyer to use the information with some degree of calculation and forethought."). Finally, the Government's Brady and Giglio obligations exist whether or not the information has been recorded in tangible form, and they apply to information that would not necessarily be admissible as evidence in its present form, but is material information potentially leading to admissible evidence favorable to the defense. Rodriguez, 496 F.3d at 226 & n.4.

In considering the specific request the defense makes here — that this court should order the Government to provide the identities of the CWs to the defense and order the Government to produce them for interviews — Rodriguez's focus on the Government's duty to turn over material evidence to the defense "when the prosecution's investigations have made it aware" that such evidence exists is instructive. Id. at 225. The Government has represented to the court and to the defense that it is conducting an investigation into the Cicale allegations. To be sure, if that investigation results in evidence that qualifies as Brady/Giglio material, the Government is duty bound to provide it to the defense. See United States v. Payne, 63 F.3d 1200, 1208 (2d Cir.

6

1995). Notably absent from the Government's obligation under Brady, however, is a responsibility to facilitate the Defendant's own investigation into the *possibility* that Brady material exists, much less a requirement that the court order such facilitation.[2]

At this time, the court has no reason to believe that the Government is suppressing Brady material,[3] as the defense implies in its argument, and the defense has every right to conduct an investigation into the information the Government has provided to date. See United States v. LeRoy, 687 F.2d 610, 618 (2d Cir. 1982) (for Brady purposes "[e]vidence is not suppressed if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.") Given the Government's ongoing investigation, the defense request that this court order production of cooperating witnesses for interviews is premature at best. The court expects the Government will conduct its investigation promptly and efficiently and will inform the court and defense counsel of the results pursuant to its constitutional obligations. In the meantime, in order to fulfill their investigatory duties to their client, defense counsel may seek to interview CW-1 by contacting his attorney once that information is made known to them. Defense counsel may also seek, through proper procedures,

---

[2] The Government has made clear that it will provide the name of CW-1 and his attorney to the defense. The court assumes the Government will stand by this representation, and at that time, Basciano's defense team will be free to pursue an interview with CW-1, if he wishes to speak with them.

[3] The ultimate question of whether the Government is in violation of Brady with respect to either Case No. 03-CR-929 or Case No. 05-060 and whether the court should hold an evidentiary hearing on the matter is the subject of other pending motions before the court. I make no findings and reach no conclusions on that issue today. Rather, the court's conclusion is that at this stage of the investigation into the Cicale matter, the court cannot assume that the Government is suppressing Brady material that would warrant an Order requiring the production of the CWs for interviews.

7

to interview prison personnel who may have knowledge of the allegations.[4]

In sum, the court declines to order the Government to disclose identities and to facilitate witness interviews at this time, though the Defendant may renew his request at a later date as more evidence about these allegations becomes available.

Finally, the court orders that any information the Government chooses to disclose voluntarily — such as the identity of CW-1 and CW-1's attorney — may not be disseminated beyond Basciano's defense team, to include the Defendant, Defendant's counsel, and Defendant's paralegals and investigators. The decision to disclose the identities of Government witnesses is within the court's discretion, see United States v. Cannone, 528 F.2d 296, 301 (2d Cir. 1975), and public dissemination of the identity of a cooperating witness could endanger the witness's safety, see United States v. Garcia, 406 F. Supp. 2d 304, 306 (S.D.N.Y. 2005) (concluding that it is appropriate in a case where a witness may face retaliation or intimidation to restrict the circulation of § 3500 material; noting that where defendants are accused of repeated acts of violence, including murder, witness intimidation is always to be feared). Given the

---

[4] Defense counsel contends that they have been stymied in their efforts at investigation thusfar, as evidenced by a letter from a BOP staff attorney denying their request to interview four MCC staff members and to obtain documents related to the Cicale misconduct. (See Letter dated November 8, 2007 from Elisa Mason, MCC Staff Attorney, to Ephraim Savitt and Ying Stafford). In support of the denial, the BOP attorney cited federal regulations, authorized by 5 U.S.C. § 301, requiring that such requests be "channeled" through the United States Attorney's Office. See 28 C.F.R. §§ 16.21-16.29. In a November 27, 2007 letter to the Government, Basciano's counsel set forth numerous discovery requests, including a request for documents related to the Cicale allegations and a request to interview certain MCC personnel about the allegations. (See Letter dated November 27, 2007 from Basciano's counsel to Assistant United States Attorneys John Buretta and Amy Busa at 6.) The Government has yet to respond to these requests, and thus the court cannot conclude that defense counsel's efforts to interview certain prison personnel have been hampered simply by the BOP's refusal to accommodate defense counsel's request. In any event, the Government's instant request for a protective order applies only to CWs 1, 2, and 3.

potential danger to CW-1 of disseminating his identity beyond the defense team and given the Government's willingness to provide his identity to the defense for their use, I find that a protective order prohibiting further dissemination is warranted.

For the same reason, the court grants the Government's request to redact the names and initials of CW-2 and CW-3 from the affidavits submitted *ex parte* and under seal. Upon such redaction, the court directs the Government to provide the affidavits to Basciano's defense team for its review, as the Government has already indicated it will do. If counsel for the non-death-eligible defendants in this case believe they can show good cause as to why they should also have access to the redacted affidavits, they should make that request by way of a motion to the court. Finally, the parties should be prepared to discuss at the December 20, 2007 oral argument already scheduled with respect to Basciano whether or not the motion papers and supporting documents, in their redacted form, should remain under seal.

### III. Conclusion

Accordingly, the Government's Motion for a Protective Order is GRANTED.

SO ORDERED.

Dated: December 19, 2007
      Brooklyn, N.Y.

      s/ Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge