UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                          **MEMORANDUM & ORDER**

             v.                                           03-CR-929 (NGG)


VINCENT BASCIANO,

                        Defendant.
-------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

      Defendant Vincent Basciano ("Basciano" or "Defendant") was convicted by jury verdict

before this court on July 31, 2007 of one count of racketeering, which included the racketeering

acts of conspiracy to murder and murder of Frank Santoro ("Santoro"), solicitation to murder

Dominick Martino ("Martino"), solicitation to murder Salvatore Vitale ("Vitale"), conspiracy to

distribute marijuana, illegal gambling (lottery), and illegal gambling (sports betting); and the

following additional substantive counts, to wit: illegal gambling (joker poker machines),

conspiracy to distribute marijuana, illegal gambling (lottery), and illegal gambling (sports

betting).[1]

      Currently before the court is Defendant's post-trial motion for a new trial based on three

_____

    [1] Prior to the July 2007 retrial that is the subject of the instant motion, Basciano was
convicted by a jury on May 9, 2006 of RICO conspiracy, which included numerous racketeering
acts that the jury found "proved." However, the jury found several extortionate extension of
credit acts "not proved" and found Basciano "not guilty" of one substantive count of extortionate
collection of credit conspiracy. The jury was also unable to reach a verdict on the predicate acts
of conspiracy to murder and murder of Frank Santoro, solicitation to murder Dominick Martino,
and on one substantive count of illegal gambling. Basciano's retrial included those accusations
on which the jury did not reach a verdict in the 2006 trial.

claims: (1) that the Government suppressed evidence, in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), in that, shortly before testifying at trial, cooperating witness Dominick Cicale ("Cicale") solicited Witness Security ("Witsec") inmates to frame Basciano and a senior corrections officer in a bogus plot to murder Cicale; (2) the denial of Basciano's right to conflict-free counsel; and (3) this court's refusal to recuse itself subsequent to discovery of an alleged "hit list" admittedly in the Defendant's handwriting bearing my name, among others. Basciano also moves for an evidentiary hearing and for an order compelling discovery.

For the reasons set forth below, Defendant's motions are DENIED.

## I. Fed. R. Crim. P. 33 Standard for a New Trial

Federal Rule of Criminal Procedure 33 provides that "upon the defendant's motion the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." <u>United States v. Ferguson</u>, 246 F.3d 129, 134 (2d Cir. 1997). The Second Circuit has counseled that a district court should exercise such authority only "in the most extraordinary circumstances." <u>United States v. Locascio</u>, 6 F.3d 924, 949 (2d Cir. 1993); <u>United States v. Sanchez</u>, 969 F.2d 1409, 1414 (2d Cir. 1992) (a district court should exercise its discretion to grant a new trial "sparingly").

The bases for the instant motions involve discrete issues, the facts relevant to which do not lend themselves to chronological presentation. Therefore, the background facts and legal discussion relevant to them are organized in accordance with the separate bases for Basciano's motion for a new trial.

A.    **The Cicale Allegations**[2]

On August 13, 2007, Marco Santomaggio ("Santomaggio"), a Metropolitan Correctional

Center ("MCC") prison guard, informed Basciano's attorneys that, just prior to jury selection in

Basciano's July 2007 retrial, Cicale solicited CW-1[3] to claim falsely that Basciano had asked

CW-1 to kill Cicale on Basciano's behalf.  On August 15, 2007, Basciano's counsel informed the

court ex parte of this allegation.  (See Defense Counsel's August 15, 2007 ex parte letter to the

court.)  On September 10, 2007, Basciano's attorneys filed a sworn affidavit from Santomaggio

in which he attested that, on July 31, 2007, Supervisory Officer Regina Eldridge ("Eldridge")

advised him that Cicale had propositioned inmate WI-1 "in a bogus murder solicitation plot that

allegedly involved Vincent Basciano and [Santomaggio]."  (Defendant's Memorandum in

Support of Omnibus Post-Trial Motion for a New Trial, For an Evidentiary Hearing, and to

Compel Discovery ("Def.'s Br.") (Docket Entry # 1049) at Ex. 1, Santomaggio Aff. ¶ 2.)

According to Santomaggio, Eldridge told him that when WI-1 informed her of the matter,

she "took it to the people who needed to know about it," including the MCC's Security

Investigative Services.  Santomaggio also stated that Eldridge suggested he talk to WI-1 and a

fellow inmate ("WI-2") to verify her information.  (Id.)  WI-1 informed Santomaggio that, in

early July, Cicale had been "giving orders" to other Witsec inmates to create mischief in the unit,

including "acts of murder sabotage, such as throwing water in the units [sic] cable box and

pouring coffee all over the unit kitchen floor prior to inspection."  (Id. ¶ 4.)  WI-1 told

----

[2] For purposes of this motion, the court assumes, *arguendo*, that the Cicale allegations are
true.

[3] CW-1 is a cooperating witness in an unrelated matter.

Santomaggio that he had informed prosecutors of Cicale's bogus murder plan "soon after Basciano's conviction." (Id. ¶ 6.) Finally, WI-2 also informed Santomaggio that Cicale had solicited fellow inmates to claim that Santomaggio was involved in the murder plot. (Id. ¶ 3.)

Pursuant to an order of this court directing the Government to respond to the allegations, the Government stated that prosecutors had no knowledge of these allegations prior to August 17, 2007 when CW-1 relayed it to an Assistant United States Attorney ("AUSA"). (Government's September 26, 2007 letter to the court at 2.) The Government further stated that the U.S. Attorney's Office had determined that CW-1 did not inform any AUSA or anyone outside the MCC of the allegation prior to August 17, 2007. (Id.)

In connection with an earlier motion before this court, the Government submitted compelled statements of MCC personnel obtained by the Office of Internal Affairs of the Federal Bureau of Prisons ("OIA") during an investigation into alleged "inattention to duty" by MCC staff with respect to the Cicale allegations. (See Memorandum and Order granting Government's motion for protective order (Docket Entry # 1011) at 2-3.) The affidavits make clear that Bureau of Prisons ("BOP") Correctional Counselor Gloria Black ("Black") learned of the plot as early as June 11, 2007. (Black Aff. ¶ 3.) She then prepared a report and informed Eldridge of the allegation the next day. (Id. ¶¶ 2, 5; Eldridge Aff. ¶¶ 3-4.) Lieutenant Courtney Shepard ("Shepard") also received a copy of Black's memorandum but did not take action on it. (Shepard Aff. ¶¶ 3, 10.) However, as Defendant notes, there are inconsistencies in the affidavits as to, inter alia, whether Eldridge asked Shepard to interview CW-1 and another inmate and whether or not he did so, whether Shepard then provided a copy of the memorandum to his supervisor, Mary Wade-Jones ("Wade-Jones"), and when Wade-Jones in fact learned about the allegation.

4

(See Def.'s Mem. at 30-32.)  In addition, Eldridge flatly denies telling Santomaggio anything about the murder plot and contends that Santomaggio lied in his affidavit.  (See id.; Eldridge Aff. ¶¶ 9, 22-23.)

Subsequent to the revelation of the alleged plot, the Government has consistently represented to this court, and does so again in its opposition to the instant motions, that (1) CW-1 did not inform any AUSA of the Cicale allegations prior to August 17, 2007; (2) CW-1 did not inform anyone in the F.B.I. of the allegation prior to Aug 17, 2007; and (3) the only persons CW-1 informed about the allegation prior to August 17, 2007 were certain BOP personnel at the MCC who are responsible for guarding inmates.  The Government adds that different F.B.I. squads are the responsible investigating agencies for CW-1 and Basciano and that CW-1 informed neither of these squads nor anyone else in the F.B.I. of the allegations.  Further, the Government states that employees of the Special Investigative Services section of the MCC, who were informed of the allegation by BOP Protective Custody Unit employees, did not inform anyone outside MCC prior to Basciano's conviction.  Finally, Ken Haas, the Unit Manager responsible for supervising the implementation of SAMs[4] in Unit 10 South, attests in an affidavit that he was not informed of the Cicale allegations and had no knowledge of the underlying facts surrounding the allegations prior to Basciano's conviction.  (Govt's Br. at 20-21 & Exhs. B (MCC Staff Affs.), C (Haas Aff.).)

In order to warrant a new trial where the Government has failed to disclose evidence

---

[4] SAMs are implemented pursuant to 28 C.F.R. § 501.3(a), which provides that "[u]pon direction of the Attorney General, the Director, Bureau of Prisons, may authorize the Warden to implement special administrative measures that are reasonably necessary to protect persons against the risk of death or serious bodily injury. . . . These procedures may be implemented upon written notification to the Director, Bureau of Prisons, by the Attorney General."

favorable to the defense, the defendant must show that the evidence is "material." Kyles v. Whitley, 514 U.S. 419, 434 (1995); see also United States v. Avellino, 136 F.3d 249, 256 (2d Cir. 1998) ("[i]f the government has failed to disclose to the defendant evidence favorable to him, relief is warranted only if the evidence was "material."). The "touchstone of materiality is a 'reasonable probability' of a different result," and the question for the court is whether, in the absence of the suppressed evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." Kyles, 514 U.S. at 434 (citation and internal quotation marks omitted). To make this determination, the court must look to "the cumulative effect of suppression in light of the evidence as a whole." United States v. Jackson, 345 F.3d 59, 73-74 (2d Cir. 2003) (internal citations and quotation marks omitted).

With regard to suppressed impeachment evidence specifically, "new impeachment evidence is not material, and thus a new trial is not required, when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable. " United States v. Parkes, 497 F.3d 220, 233 (2d Cir. 2007). Further, "a new trial is generally not required when the testimony of the witness is corroborated by other testimony." Jackson, 345 F.3d at 74 (citation and internal quotation marks omitted); see also United States v. Orena, 145 F.3d 551, 558 (2d Cir. 1998) ("the existence of substantial independent evidence of guilt is unavoidably relevant to whether withheld impeachment evidence can reasonably call the jury's verdict into question") (citation omitted)).

Defendant argues that an evidentiary hearing is necessary to determine whether the

prosecutors in Basciano's case had actual knowledge of the Cicale allegations prior to Basciano's retrial. However, even if they did not have actual knowledge, Defendant argues, they had constructive knowledge because (1) they had a duty to seek out any evidence favorable to the defense from other government agencies working with the prosecution and (2) the actual knowledge of BOP personnel and other Justice Department officials who were part of the "prosecution team" should be imputed to the prosecutors. (Id. at 18-30.)

The court has no reason to doubt the Government's repeated representations that the prosecutors in this case did not have actual knowledge of the Cicale allegations prior to August 17, 2007, some two weeks after Basciano's conviction. In any event, the court declines to reach the issue of whether the Government suppressed evidence of the Cicale allegations — whether actual or constructive — because, as discussed in detail below, even if the Government did suppress evidence of the allegation, Defendant has failed to establish that such evidence is "material" such that it undermines confidence in the outcome of the trial.[5] See United States v. Gambino, 59 F.3d 353, 366 (2d Cir. 1995) ("Finding a lack of materiality, we need not decide whether the [evidence] was 'suppressed,' in other words, whether the knowledge of the tape's

---

[5] In his reply brief, Defendant argues that the Government urges an incorrect standard for granting a motion for new trial, namely the standard for a new trial based on newly discovered evidence where no Brady violation has occurred. (See Reply Memorandum in Support of Omnibus Post-Trial Motion for New Trial, For an Evidentiary Hearing, and to Compel Discovery ("Reply Br.") at 1-2.) This standard requires a defendant to show that the newly discovered evidence would "probably lead to an acquittal." (Id. at 1.) Defendant is correct that the legal standard governing a motion for new trial where a Brady violation has occurred is whether, in the absence of the suppressed evidence, the defendant received a fair trial, i.e., whether the government's "evidentiary suppression undermines confidence in the outcome of the trial." Kyles, 514 U.S. at 434. For purposes of the following analysis, the court assumes, *arguendo*, that the Government suppressed evidence of the Cicale allegation in this case. Accordingly, the court's analysis proceeds under the standard set forth in Kyles and its progeny.

existence should be imputed to the prosecution, based on its having been available to the F.B.I.."); see also United States v. Stewart, 433 F.3d 273, 299 (2d Cir. 2006) ("Ultimately, whether the prosecution was aware of the alleged perjury is of no moment, because we conclude that the testimony in question was not material . . ."); United States v. Coppa, 267 F.3d 132, 140 (2d Cir. 2001) ("the scope of the government's constitutional duty-and, concomitantly, the scope of a defendant's constitutional right-is ultimately defined retrospectively, by reference to the likely effect that the suppression of particular evidence had on the outcome of the trial.").

The court now turns to whether the Cicale allegations are "material," i.e. whether the jury's knowledge of the allegations would have put the case in such a different light as to undermine confidence in the verdict. Defendant argues that the allegation is material because Cicale was "the government's star witness who provided the most significant evidence of every element of every charge in the indictment," and because Cicale "supplied all the details [of the Santoro murder] that were not supplied by any other witness."[6] (Def.'s Br. at 50.) In addition, Defendant contends that the Government repeatedly vouched for Cicale's character and told the jury that his motive to tell the truth as a cooperating witness was "unimpeachable." (Id.)

Central to Defendant's argument is the contention that the impeachment evidence at issue here is "of a wholly different order" than the other impeachment evidence offered against Cicale because it occurred after he supposedly "saw the light" and began cooperating with the Government. Thus, the jury could have been informed that Cicale was "still cunning and

_____

[6] Basciano has attached an Addendum to his memorandum of law detailing these items in support of this contention and his broader contention that only Cicale testified to numerous important elements of the crimes for which Basciano was convicted. (See Addendum to Def's Br.)

manipulative; he was defrauding the very people who were vouching for him, and was more than willing to frame Mr. Basciano with his testimony." (Id. at 52, 54.) In short, "[e]xposure to Cicale's own words and conduct at MCC would have totally undermined the prosecutor's argument that Cicale knew he had too much to lose to lie, and it would have made the defense case that he was lying and framing Mr. Basciano at trial much more plausible." (Id. at 53, 55-57.)

Although evidence of the Cicale allegation arguably might have been helpful to the defense, there is not a "reasonable probability" of a different result at trial had the evidence been available. First, Defendant mischaracterizes the centrality of Cicale's testimony in establishing the elements of the charges for which Basciano was convicted and gives short shrift to the multitude of other evidence offered against him. See Orena, 145 F.3d at 558 ("substantial independent evidence of guilt is unavoidably relevant to whether withheld impeachment evidence can reasonably call the jury's verdict into question"); Avellino, 136 F.3d at 256-57 (impeaching matter may be found material where the witness supplied the only evidence of an essential element of the offense").

As to the Santoro murder charge, the Government offered Basciano's own recorded statements, the testimony of cooperators Salvatore Vitale, Nicholas Pisciotti, Richard Cantarella, and James Tartaglione, the testimony of Kenneth Champlin and Carmine Naddeo, and certain physical evidence corroborating the details of the murder provided by the witnesses. (See Trial Tr. at 307-309; 3429-32; 1974-75; 2259; 1628-29;1709-12.) Basciano's recorded statements and testimony from Cantarella also implicated Basciano in the Martino solicitation. (See Trial Tr. at 1924-27.) Similarly, Basciano's recorded statements corroborated Cicale's testimony with

regard to the Vitale murder solicitation. (Govt's Br. at 9-10.)[7] Finally, witnesses other than

Cicale testified to Basciano's involvement in marijuana distribution and illegal gambling. (Trial

Tr. at 3303-16; 2890-92; 3655-60, 3593-94; 3634-40; 3649-69.) In short, significant independent

evidence and evidence that corroborated Cicale's testimony implicated Basciano in the crimes for

which he was convicted. See Jackson, 345 F.3d at 74 (upholding the denial of a motion for new

trial where the jury's verdict was supported by compelling evidence; the undisclosed

impeachment materials were of "limited utility" because there was no reasonable probability that

there would have been a different result if the evidence had been in the defendants' hands at

trial); Orena, 145 F.3d at 559 ("the strength of the independent evidence of appellees' guilt

increases the degree of significance that would need to be ascribed to the withheld impeachment

evidence in order for it to reasonably undermine confidence in the verdict").

Second, during direct examination and a thorough and aggressive cross-examination

lasting nearly nine hours, the jury heard significant impeachment evidence against Cicale. The

jury learned of Cicale's extensive violent and criminal past, including a conviction for

manslaughter, involvement in two other murders, drug dealing, assaults, shootings, armed

robbery while on bail, arson, fraudulent check cashing, violations of prison regulations,

violations of supervised release, and defrauding his own grandmother. (Trial Tr. at 965, 968-69,

973-76, 978-84, 991-92, 1007-11, 1298-1300, 1331-36, 1354, 1376-77, 1380, 1387-89, 1391-93,

1424-34.) Significantly, the jury also learned that Cicale had lied during his first proffer session

---

[7] It bears noting that in his Reply Brief, Defendant does not call into question a single factual citation the Government offers in support of its argument that there was overwhelming evidence of Basciano's guilt independent of Cicale's testimony. Instead, he repeats the general assertion that Cicale was the "central" witness around whom the Government built its case. (Reply Br. at 2-5.)

with the Government, (id. at 1298), and defense counsel sought to show that he made

inconsistent statements during debriefings with the Government and at Basciano's earlier trial,

(see Gov't's Br. at 13.)  Thus, Defendant's argument that the Cicale allegations are of a "wholly

different order" than the other impeachment evidence offered against him rings hollow:  the jury

already knew Cicale was capable of deception subsequent to his decision to become a

cooperator.[8]  Knowledge of the bogus murder plot would not have substantially aided the jury in

assessing Cicale's credibility, given the already plentiful impeachment evidence offered against

him.

The Second Circuit's analysis in United States v. Gambino, 59 F.3d 353 (2d Cir. 1995)

supports this conclusion.  In Gambino, the court described a suppressed recording on which a

government witness gave instructions on how to confound a grand jury as "quintessential Brady

material.  Rarely does a defense attorney have such a useful weapon for attacking the credibility

---

[8] Defendant's reliance on United States v. Boyd, 55 F.3d 239 (7th Cir. 1995) and United States v. Wallach, 935 F.2d 445 (2d Cir. 1991) in this regard is unavailing.  In Boyd, the Brady evidence at issue involved cooperating witnesses "receiv[ing] a continuous stream of unlawful, indeed scandalous, favors from staff at the U.S. Attorney's office while jailed at the MCC awaiting trial of the defendants."  Boyd 55 F.3d at 244.  Indeed, in that case the U.S. Attorney's office permitted the witnesses to entertain visitors in the U.S. Attorney's Office, where the visitors were able to pass drugs to the witnesses and have sexual intercourse with them.  The court noted that the Government, while not aware of these details, "was well aware of the opportunity that the visits afforded" for these activities.  Id.  Further, the testimony of the witnesses involved was "essential" to the case and the witnesses perjured themselves at trial by testifying that their involvement with drugs had ceased.  Id. at 242-43, 245-46.  Thus, in Boyd the materiality of the impeachment evidence depended upon the clear scandal in the prosecutor's office, the essential nature of the witnesses' testimony, and the fact that the information could have uncovered perjured testimony offered at trial.
Similarly, the two cooperating witnesses in Wallach "provided the foundation upon which the prosecution built its entire case" and offered "the only testimony that directly linked the defendants with" illegal conduct.  Wallach, 935 F.2d at 455.  As discussed above, neither is true of Cicale in this case.

of a government witness." Id. at 366. Nonetheless, the court held that the lengthy and precise cross-examination of the witness, which touched on numerous murders and acts of obstructing justice, gave the jury "a fair opportunity to evaluate the witness' credibility. The existence of the [impeachment] evidence does nothing to undermine confidence in [the defendant's] conviction . . . [and] does not therefore amount to material evidence the suppression of which would warrant a new trial." Id. Evidence of the Cicale allegations was similarly cumulative here; as such, it is not material as it must be to warrant a new trial. See Avellino, 136 F.3d at 258; Orena, 145 F.3d at 560 ("devastating impeachment evidence already available to defendants" rendered new evidence that cooperating witness had lied to the FBI about a murder he committed cumulative).

Finally, the court has reviewed the transcripts of the Government's arguments to the jury at trial. Defendant's portrayal of the Government as painting Cicale as its "star witness" who had undergone a moral transformation is overblown. The Government was forthright about the checkered pasts of all of its cooperators, (Trial Tr. at 103-04), and explained generally the self-interest inherent in choosing to cooperate, namely the desire to avoid a harsher prison sentence, (id. at 4465-66.) In addition, it is clear from the record that the Government's summation, which described the way in which cooperation agreements function — that cooperators have an incentive to tell the truth in order to avoid harsher sentences and that they face danger for deciding to cooperate — was in response to defense counsel's suggestion that cooperators choose to cooperate in order to get a "free pass." (Id. at 4687-93.) The assertions the Government made about its cooperators' motivations to tell the truth were indisputably true, and the Government did not suggest, nor would the jury have plausibly believed, that no cooperating witness could be capable of fabricating testimony. Finally, and most importantly, although the Government

mentions Cicale at points during these general discussions, the defense points to no place in the transcript where the Government lauded Cicale as its "star" witness or indicated that he had undergone a moral transformation that precluded fabricated testimony.

For the foregoing reasons, the Cicale allegations, even assuming they were suppressed by the Government, are not material and therefore a new trial is not warranted on that basis. Given this conclusion, an evidentiary hearing further exploring the Cicale allegations themselves and the Government's knowledge of the allegations is unnecessary, and the court denies Defendant's request.[9] See Stewart, 433 F.3d at 302 (holding that the district court did not abuse its discretion in denying Rule 33 relief without holding an evidentiary hearing to ascertain the extent of the Government's awareness of a witness's perjury; "[w]here, as here, the additional evidence of perjury is not sufficiently material to undermine confidence in the verdict, there is no need to probe the extent of the Government's awareness of the perjury"); United States v. Spinelli, No. 97 CR 209 (RJD), 2007 WL 3231967, *6 ( E.D.N.Y. Oct. 30, 2007) ("Because a new trial is not warranted . . . an evidentiary hearing to determine whether the government knew or should have known of [witness's] perjury is unnecessary.") (citing Stewart).

**B. Alleged Conflict of Counsel**

Basciano was represented at trial by James Kousouros ("Kousouros"), Stephanie Carvlin

---

[9] Similarly, Defendant's request for an order compelling discovery pertains to documents that either purportedly explain more about the substance of the Cicale allegations, the basic contours of which the parties and the court are now fully aware, or are relevant to whether the government had knowledge of the allegations. Because the court assumes the truth of the allegations and the Government's knowledge of them for purposes of this motion, additional discovery is not necessary to its resolution. Thus, the request is denied as to Case No. 03-CR-929. Defendant may renew his request for discovery as necessary with respect to his upcoming trial in Case No. 05-CR-060.

("Carvlin"), and Allan Brenner ("Brenner"), all of whom were retained. (Govt's Br. at 86.) At a pretrial conference on November 3, 2006 — seven months prior to the start of jury selection — the parties disclosed to the court a potential conflict due to Kousouros's prior relationship with cooperating witness Thomas Lee ("Lee"): Kousouros had had conversations with Lee before he was arrested, after he was arrested, and after he had begun cooperating with the Government.[10] (Id. Ex. J at 7-8.) Kousouros informed the court that Basciano understood the conflict but was willing to waive it. (Id. at 9-10.) Pursuant to United States v. Curcio, 680 F.2d 881 (2d Cir. 1982), the court gave Basciano an opportunity to consult with independent counsel about the conflict and appointed Zachary Margulis-Ohnuma ("Margulis-Ohnuma") for that purpose. (Docket Entries # 653, 656.) A hearing on the matter took place on December 15, 2006.

At the hearing, Margulis-Ohnuma informed the court that the Government had explained the potential conflict to him, that he had spoken to Kousouros about the facts, and that he had spoken "at some length" with Basciano about whether he wanted to waive the conflict. (December 15, 2006 Transcript of Status Conference at 2.) Margulis-Ohnuma stated that he and Basciano agreed there was a conflict, that it was waivable, and that Basciano had indicated that he "understands the issue." Margulis-Ohnuma further stated that Basciano waived the conflict and that there was an understanding that Carvlin, not Kousouros, would cross-examine Lee at trial.[11] (Id. at 3.)

---

[10] The record is unclear as to exactly what Kousouros advised Lee to do. Basciano has submitted *pro se* documents to the court stating that Kousouros informed him that he advised Lee to cooperate against Basciano. (See, e.g. Letter to the court dated February 21, 2008 from Vincent Basciano.) Defense counsel states that Kousouros "has conceded only that he counseled Lee 'to do the right thing.'" (Def's Br. at 64 n.15.)

[11] At this point, Lee had already testified against Basciano in his first trial.

When asked by the court to explain the nature of the potential conflict, the Government

stated that Lee arguably held privileged conversations with Kousouros about his criminal case

before and after Lee was arrested.  (Id.)  The Government added that "there could have been

advise [sic] given about how Mr. Lee should proceed with respect to his criminal case."  (Id.)  In

response, Margulis-Ohnuma stated that:

> Mr. Kousouros confirmed all of that to me.  I think we're on the same page, and
> he has told me he committed not to cross-examine Mr. Lee and not to divulge any
> of the contents of the conferring conversation that he had with Mr. Lee.  I
> explained that to Mr. Basciano, he understands it, he understands that there are
> some limitations on his lawyers as a result and he still expresses absolute
> confidence in Mr. Kousouros to move forward.

(Id. at 4.)

The court then asked Basciano directly whether he understood the preceding discussion,

the nature of the potential conflict, and how it would be dealt with at trial.  Basciano responded

"yes" to each question.  (Id. at 4-5.)  The court then asked whether Basciano wished to continue

with Kousouros as his primary defense counsel, to which Basciano responded, "Absolutely."  (Id.

at 5.)  Lee testified against Basciano at trial, and Brenner conducted the cross-examination of

Lee.

A criminal defendant has a right to conflict-free counsel.  Wood v. Georgia, 450 U.S.

261, 271 (1981).  This right may be violated if the attorney has "(1) a potential conflict of interest

that results in prejudice to the defendant, or (2) an actual conflict of interest that adversely affects

the attorney's performance."  United States v. Levy, 25 F.3d 146, 152 (2d Cir. 1994).  "An

attorney has an actual, as opposed to a potential, conflict of interest when, during the course of

the representation, the attorney's and defendant's interests diverge with respect to a material

factual or legal issue or to a course of action." United States v. Schwarz, 283 F.3d 76, 91 (2d Cir. 2002). A potential conflict exists if "the interests of the defendant may place the attorney under inconsistent duties at some time in the future." United States v. Kliti, 156 F.3d 150, 153 n.3 (2d Cir. 1998).

Conflicts involving an attorney's prior representation of a trial witness are generally waivable. United States v. Perez, 325 F.3d 115, 127 (2d Cir. 2003). The waiver will be honored if it is "knowing and intelligent," and "whether waiver of a conflict of interest is knowing and intelligent depends on the circumstances of each individual case." United States v. Williams, 372 F.3d 96, 107-08 (2d Cir. 2004) (citation and internal quotation marks omitted). To ensure that the defendant's choice is knowing and intelligent, the trial judge must: "(i) advise the defendant of the dangers arising from the particular conflict; (ii) determine through questions that are likely to be answered in narrative form whether the defendant understands those risks and freely chooses to run them; and (iii) give the defendant time to digest and contemplate the risks after encouraging him or her to seek advice from independent counsel." United States v. Fan, 36 F.3d 240, 248 (2d Cir. 1994); see also United States v. Jones, 381 F.3d 114, 120 (2d Cir. 2004) (if the district court finds that an attorney "suffers from an actual or potential serious conflict . . . it must then go on to determine whether a rational defendant would knowingly want to be represented by the conflicted lawyer. If not, the trial court is obliged to disqualify the attorney.").

Defendant argues first that his waiver of the potential conflict between him and Kousouros was not knowing and intelligent because neither the Government nor Mr. Kousouros fully explained the true nature of the conflict. Thus, Basciano was unable to make an informed judgement as to the waiver. (Def.'s Br. at 62-63.) In addition, Defendant argues that an actual

conflict existed at trial, namely that Kousouros could not effectively undermine Lee's credibility by exploring the "crucial line of inquiry" as to why he became a cooperator. Further, the use of Brenner to conduct Lee's cross-examination did not solve the problem because Brenner also had to avoid the issue of Kousouros's advice to Lee that he become a cooperator. (Def.'s Br. at 65, 70-72.)

The court concludes that Basciano's waiver was knowing and intelligent. First, Defendant was apprised at two separate conferences that Kousouros had engaged in conversations with Lee with regard to his criminal case before he was arrested, after he was arrested, and after he had chosen to cooperate. In addition, at the time of the Curcio hearing, Lee had already testified against Basciano in an earlier trial. The contention that Basciano was unaware of at least the possibility that Kousouros had counseled Lee to cooperate is implausible. Furthermore, the court and the Government advised Basciano of the dangers of the potential conflict, asked questions to determine that he understood the risks of the conflict, and allowed him ample time to consult with independent Curcio counsel. See Fan, 36 F.3d at 248. That Basciano purportedly did not know the exact nature of the advice Kousouros gave Lee, therefore, does not render his waiver invalid. Basciano knew that Kousouros advised Lee with respect to his criminal case and knew that such advice could have involved discussions about whether to cooperate. Finally, Basciano agreed to the proposed cure for the potential conflict, namely that one of his other trial lawyers, neither of whom had a potential conflict, would cross examine Lee. Brenner in fact did so at trial. Thus, Basciano's waiver was knowing and intelligent. See Curcio, 680 F.3d at 889 ("If the defendant reveals that he is aware of and understands the various risks and pitfalls, and that he has the rational capacity to make a decision on the basis of this

information, and if he states clearly and unequivocally that he nevertheless chooses to hazard those dangers, we would regard his waiver as knowing and intelligent.") (internal citation omitted); cf. Williams, 372 F.3d at 109 (holding that a waiver was not knowing and intelligent where the defendant was unaware of the extent of his lawyer's prior criminal activities or that his lawyer was the subject of a grand jury investigation and there was no evidence defendant knew how these facts might translate into a conflict of interest).

Even assuming Basciano's waiver was not knowing and intelligent, no prejudice resulted at trial such that Basciano was deprived of his right to conflict-free counsel. Defendant argues that the actual conflict at trial centered around Kousouros's and, by extension, Brenner's inability to question Lee about why he became a cooperator. This inability purportedly had a significant impact on the jury's ability to assess Lee's credibility. Even assuming such an inability, it had no impact on the jury's ability to assess Lee's credibility. First, the source of the advice to cooperate has little relevance to the motivations that might call a cooperating witness's credibility into question. The significant information for a jury is that a cooperating witness has committed crimes for which he hopes to receive a lesser sentence by virtue of cooperating. This was evident to the jury with respect to Lee and the point would not have been made clearer by knowing that Kousouros was the one who advised him to cooperate. Furthermore, Brenner conducted a thorough and vigorous cross-examination of Lee that called his credibility into question. (See Gov't's Br. at Ex. N.) As a result, Brenner's failure to ask about Kousouros's advice did not adversely affect Basciano. See United States v. Blount, 291 F.3d 201, 212 (2d Cir. 2002) (holding that where a member of defense counsel's firm had previously represented the government's witness in an unrelated matter, the absence of "any adverse effect" on counsel's

representation, which included "vigorous and thorough" cross-examination of the government witness, defeated Defendant's Sixth Amendment claim); cf. Schwarz, 283 F.3d at 92-95 (defendant's right to conflict-free counsel was violated where defense counsel chose to forego the "plausible alternative defense strategy" of implicating another person and such a theory was clearly viable in light of the evidence).

Thus, Basciano's right to conflict-free counsel was not denied in this case, and the argument fails as a basis for a new trial.

### C.    Denial of the 2006 Motion to Recuse

In July 2006, the Government disclosed to the court under seal that according to an inmate housed with Basciano at the MCC, Basciano had written a list containing the names of five individuals Basciano wanted murdered: myself, lead prosecutor Greg Andres, and three cooperating witnesses involved in Basciano's 2006 trial. United States v. Basciano, 2006 WL 3483924, *1 (Nov. 30, 2006 E.D.N.Y). According to the Government, Basciano had indicated to the inmate that he wanted the individuals killed, the inmate took no action on the request, and Basciano did not pursue the issue any further. Id. The Government also maintained that in a June 8, 2006 telephone call to his wife from prison, Basciano told her he was "going to try to get a different judge," and in order to do so, he would "have to pull all the rabbits out of [his] hat." Id. Basciano contended at the time, and has contended consistently since, that the list was not a hit list but was rather a Santeria list designed to help the outcome of Basciano's trial. Id. Shortly after discovery of the list, Basciano was placed in a restrictive housing unit at the MCC and ultimately was placed under SAMs authorized by the United States Attorney General. (See January 14, 2008 M&O in Case No. 07-CV-421 at 6.)

19

As a result of the list's discovery, Basciano and two codefendants sought the court's recusal, arguing that an alleged death threat against the court created an appearance of partiality. Basciano, 2006 WL 3483924, at *1. On November 30, 2006, the court denied the motion, finding that one of Basciano's objectives in writing the list appeared to be to "engineer" the court's recusal. Id. at 2. The court took into account that Basciano was a "sophisticated" party capable of seeking to engineer the court's recusal, that the motion followed closely on the heels of his conviction before this court, and that Basciano had stated to his wife that he sought a different judge. Id. at *2. Further, none of the defendants had asserted that the court had displayed actual bias towards Basciano. Thus, the court concluded, a "reasonable person" would not "reasonably question this court's impartiality." Id.

On January 30, 2007, Basciano filed a habeas petition seeking release from the Special Housing Unit and from SAMs. (See Case No. 07-CV-421 (Docket Entry # 1).) After Magistrate Judge Robert M. Levy recommended that the petition be denied, in large part based on his conclusion that the list was a hit list, (see Report and Recommendation dated May 5, 2007 (Case No. 07-CV-421(Docket Entry # 17)), this court denied the petition, (see Memorandum and Order dated January 14, 2008 (Case No. 07-CV-421 (Docket Entry #41))). The court declined to make a factual finding on whether or not the list was actually a "hit list."

First, Defendant contends that this court erred in denying his previous motion to recuse under 28 U.S.C. § 455(a) because "[a] disinterested observer would be quite reasonable if he questioned the impartiality of a judge in a criminal case who learn of a plot by the defendant to murder him." (Defendant Mem. at 73.) In Defendant's view, no factual basis existed for concluding that the list was intended to engineer the court's recusal and the court erred in failing

to make a factual determination as to whether it took the threat seriously.  (Id. at 75-76.)  Second, Defendant points to the court's January 2008 decision to deny Basciano's habeas petition, in which he sought release from SHU and SAMs restrictions, and its decision not to make a factual finding therein as to the nature of the list as further evidence that a disinterested observer would conclude that the court "harbors a biased determination to insure that defendant's conviction in the '03 case is not overturned and that he is convicted in the '05 case."  (Id. at 78-79.)  In sum, the hit list itself, the earlier decision not to recuse, and the later denial of habeas relief, in defendant's view, create an appearance that this court is biased.

A judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  28 U.S.C. § 455(a).  The decision whether to grant or deny a recusal motion is left to the discretion of the district court.  United States v. Muyet, 994 F. Supp. 550, 554 (S.D.N.Y. 1998) (citations omitted).  "Judicial rulings alone almost never constitute a valid basis for a bias or partiality motion," and "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible."  Liteky v. United States, 510 U.S. 540, 555 (1994); see also United States v. Conte, 99 F.3d 60, 65 (2d Cir. 1996) ("Events occurring in the course of judicial proceedings generally do not constitute a basis for recusal absent indications that the judge's decision-making was so prejudiced that it called into question the fairness of the proceedings.")

The court does not agree with Defendant that its earlier decision not to recuse itself was in error, much less that the decision created an appearance of partiality sufficient to call into question

the fairness of Basciano's retrial.[12]  Contrary to Defendant's assertions, the court explicitly

addressed the "issue of appearance" in its previous opinion, concluding that a "reasonable

observer under the circumstances would not reasonably question the court's impartiality."  In

addition, the court offered specific factual reasons for its conclusion that one of Basciano's

objectives appeared to be to manipulate the judicial process, regardless of whether the list was in

fact intended as a hit list.  See Basciano, 2006 WL 3483924, at *2.

Significantly, the Second Circuit has rejected contentions nearly identical to those

Defendant offers here.  In LoCascio v. United States, 473 F.3d 493, 494-96 (2d. Cir. 2007) (per

curiam), the court rejected the defendant's contention that, inter alia, the trial court's repeated

denials of the defendant's pre-trial, trial, and post-conviction motions mandated recusal.   These

adverse decisions did not raise "even a suspicion of a 'deep-seated and unequivocal antagonism

that would render fair judgment impossible.'"  Id. at 496.  Similarly here, Defendant points to the

original adverse recusal decision and the adverse habeas determination as support for its

contention that the court's impartiality may reasonably be questioned.  While the defense is

critical of the court's reasoning and conclusions in those opinions, it does not point to anything

contained in them that would suggest "deep-seated and unequivocal antagonism that would render

fair judgment impossible."

In Yousef v. United States, 327 F.3d 56 (2d Cir. 2003), this Circuit rejected a request to

vacate the defendants' convictions based on the judge's refusal to recuse himself after he became

---

[12] The court is aware that the instant motion is not an appeal from the earlier recusal
decision, much as Defendant's argument sounds that way.  However, brief consideration of that
decision is necessary to determine whether the decision gives rise to an appearance of partiality
on the part of the court.

aware that the defendants had discussed the possibility of kidnapping and harming an unnamed federal judge. Id. at 169. The court concluded that recusal was not warranted "even if we assume that [the trial judge] was aware of the threat and perceived it to be directed at him." Id. Specifically, the court noted that the seriousness of the threat was immediately called into question by information that the defendants had abandoned the plan. Id. at 170. Similarly here, though the Government took the threat seriously, it also informed the court that Basciano had not pursued the matter further than his initial statement to his fellow inmate.

The Yousef court also noted that other attempts by defendants to misinform the Government suggested that "this threat may well have been nothing more than an attempt to harass the government and divert resources." Id. As in Yousef, this court found in its earlier recusal decision that the list, coupled with Basciano's repeated replacing of attorneys and his statement to his wife that he needed to "get a different judge," suggested that one of Basciano's objectives was to engineer this court's recusal. Notably, Yousef distinguished United States v. Greenspan, 26 F.3d 1001 (10th Cir. 1994), a case on which Defendant relies. In Greenspan, the court concluded that a judge's response to a death threat could have contributed to the appearance of prejudice where the judge expedited a sentencing hearing to get the defendant into the federal system immediately and refused to continue the sentencing hearing at the request of defendant's newly appointed counsel. Id. at 169. The court noted the Greenspan holding that recusal would not have been warranted if there had 'been any reason to believe that [the] threats were made only in an attempt to obtain a different judge, to delay the proceedings, to harass, or for other vexatious or frivolous purpose." Id. at 169-70. While this court has not concluded that the list was "only" an attempt to obtain a different judge, for the reasons stated in its original recusal decision, that

appears to have been one of Basciano's objectives.

Finally, this case is easily distinguishable from a recent Second Circuit case in which the court vacated judgments of conviction where a district judge erred in failing to recuse himself based on the appearance of partiality surrounding the judge's "handling of, and reaction to, his prior dealings with the government's main cooperating witness concerning a mortgage application for the judge." See United States v. Amico, 486 F.3d 764, 766-67 (2d Cir. 2007). The court found that "an appearance of partiality arose from the cumulative effect of the judge's reactions to the various problems surrounding the application." Id. at 775-76. Specifically, the Government's main witness made certain accusations about the judge's mortgage application that could have led a disinterested observer to conclude that the judge's handling of the witness was intended to protect his own reputation. Id. at 776.

Furthermore, the judge repeatedly raised the subject of the witness's accusation *sua sponte*, conducted discovery on his own initiative, in lengthy pretrial sessions marshaled the evidence he had discovered, exhibited a "hostile" approach when addressing the accusations, and attempted to dissuade the government from calling the witness. Id. The court also noted that the judge repeatedly attempted to persuade defense counsel to move for a finding of perjury, concluded that the witness committed perjury, and instructed the jury *sua sponte* about perjury mid-trial. Id. Thus, "in the aggregate" these actions would lead a disinterested observer to conclude that the appearance of partiality existed," and the court could not accept the results of such a trial without damaging the public's faith in the judiciary. Id. at 776-778. Defendant fails to point to any similar pattern of actions that would suggest an appearance of partiality, instead relying on a post-trial adverse decision against him and on an assumption that a threat against the

court creates such an appearance.

A new trial is not warranted based on Defendant's recusal arguments.

**III.    Conclusion**

For the foregoing reasons, Defendant's motion for a new trial is DENIED.  Defendant's

motions for an evidentiary hearing and to compel discovery are also DENIED**.**


SO ORDERED.

                                                  ___s/ Nicholas G. Garaufis_____
Dated: March 24, 2008                             NICHOLAS G. GARAUFIS
       Brooklyn, N.Y.                             United States District Judge