205

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2      - - - - - - - - - - - - - - - X

 3   UNITED STATES OF AMERICA,      :        CR 03-929

 4             v                    :        U.S. Courthouse
                                             Brooklyn, New York
 5   VINCENT BASCIANO,              :
                                             January 18, 2006
 6             Defendant.           :        10:30 a.m.

 7      - - - - - - - - - - - - - - - X

 8
                      TRANSCRIPT OF PROCEEDINGS
 9              BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
                      UNITED STATES DISTRICT JUDGE
10

11   APPEARANCES:

12
     For the Government:      ROSLYNN R. MAUSKOPF
13                            United States Attorney
                              BY:  GRED ANDRES
14                                 AMY BUSA
                                   WINSTON CHAN
15                            Assistant U.S. Attorneys
                              One Pierrepont Plaza
16                            Brooklyn, New York 11201

17
     For the Defendant:       BARRY LEVIN, ESQ.
18

19   Also Present:
     Ephraim Savitt, Esq.
20

21   Court Reporter:          Burton H. Sulzer
                              225 Cadman Plaza East
22                            Brooklyn, New York 11201
                              (718) 260-4526
23                            Fax # (718) 260-4504

24

25   Proceedings recorded by mechanical stenography, transcript
     produced by CAT.
```

206

1           (Case called; appearances noted.)

2           THE COURT:  Good morning.

3           MR. LEVIN:  Good morning, your Honor.  Mr. Quijano

4   will not be here today, your Honor.  He has a case in the

5   Southern District.

6           MR. SAVITT:  Ephraim Savitt for Mr. Basciano.  Good

7   morning.

8           MR. ANDRES:  Greg Andres, Amy Busa, and Winston Chan

9   for the United States.  Good morning.

10          THE COURT:  Good morning everybody.

11          MR. LEVIN:  I am prepared to go forward with my

12  cross of Mr. McDonald.  I don't anticipate it being more than

13  ten or fifteen minutes and I do have a witness at 11:00

14  o'clock to finish up the Wade issue -- I mentioned it to you

15  yesterday -- if your Honor will take her today.  She's an

16  investigator that interviewed Mr. Nunez at the correctional

17  facility where he's incarcerated.

18          THE COURT:  I'll take her testimony if she'll be

19  here.

20          MR. LEVIN:  It will wrap it up.  The government

21  rested yesterday.

22          MR. ANDRES:  We have to get a couple of materials

23  together to prepare, so if we could, after the end of the

24  Messiah argument, can we get that issue resolved and then

25  start the Wade hearing?

1          MR. LEVIN:  Fine with me.

2          THE COURT:  We'll get it all done this morning, I

3     take it?

4          MR. LEVIN:  Absolutely.

5          THE COURT:  Mr. McDonald, will you resume the

6     witness stand.

7          I remind you that you are still under oath.

8     E D W A R D   M C   D O N A L D,

9        called as a witness, having been previously duly

10       sworn, was examined and testified as follows:

11    CROSS-EXAMINATION

12    BY MR. LEVIN:

13    Q    Good morning, Mr. McDonald.

14    A    Good morning, Mr. Levin.

15    Q    I believe yesterday you testified that you were contacted

16    by the court, you were asked to come in and meet with

17    Mr. Massino on August 2nd?

18    A    I was actually contacted by an Assistant United States

19    Attorney.

20    Q    Who --

21    A    -- who asked me to come to court.

22    Q    Which Assistant United States Attorney contacted you?

23    A    Mark Feldman.

24    Q    What date would that be?

25    A    I believe it was the second of August.

McDonald - cross/Levin                          208

1   Q    And --

2   A    It might have been the third.  It was the day before the

3   first debriefing session.

4   Q    So would it refresh your recollection if I told you the

5   first proffer session was on August 3rd?

6   A    Then it was August 2nd when I came down and met with the

7   judge.

8   Q    At that time you met Mr. Massino?

9   A    Yes.

10  Q    And Mr. Massino said to you "it must be my lucky day"?

11           MR. ANDRES:  Objection, Judge.

12           THE COURT:  Sustained.

13  Q    Did Mr. Massino say something to you, yes or no?

14           MR. ANDRES:  Objection.

15           THE COURT:  Sustained.

16  Q    Do you know Mr. Massino from any prior professional

17  situation as a lawyer?

18  A    I prosecuted Mr. Massino in the mid-1980s.

19  Q    Can you tell us which case that was?

20  A    The name of the case was United States versus Philip

21  Rastelli, et.al.

22  Q    What year was that?

23  A    I believe the case was indicted in 1984 or 1985 and the

24  trial occurred in 1986, a several month trial.  I didn't

25  personally try the case.  I was the supervisor.

1    Q     Thank you.

2          On August 3rd, you were present at the first proffer

3    session?

4    A     Yes.

5    Q     And Agent McCaffrey was present?

6    A     Yes.

7    Q     Assistant United States Attorney Mr. Andres was present?

8    A     Yes.

9    Q     Can you tell us what other agents were present at that

10   proffer session.

11   A     I'm trying to remember the agent's name, but he was one

12   of the case agents on the Massino case.  I think he's been

13   transferred out of the New York area.

14   Q     Would the name Agent Jeffrey Sallet ring a bell?

15   A     Yes.

16   Q     Would it be Agent Sallet?

17   A     Yes, it was Jeff Sallet.

18   Q     Thank you.  When you arrived at the proffer session, what

19   was the first thing that Mr. Massino was told by the

20   government?

21   A     I don't recall the first thing that he was told.

22   Q     What did you tell Mr. Massino in regard to the proffer

23   session?

24   A     Well, I'm not going to get into any of my conversations

25   with Mr. Massino.

McDonald - cross/Levin                    210

1          MR. LEVIN:  Your Honor, because of the nature of

2    this hearing and because the government -- and this is a

3    Messiah hearing, we are trying to figure out what if any

4    instructions Mr. Massino was given concerning what he could

5    and could not talk about.  I would suggest that that privilege

6    should be lifted for purposes of the hearing.

7          MR. ANDRES:  Judge, as usual Mr. Levin cites no law

8    to allow for the lifting of that client attorney-client.

9    Moreover, the issue is what the government's action was, not

10   what Mr. McDonald's personal interaction in his

11   attorney-client relations with Mr. Massino were.

12         MR. LEVIN:  I further point out that, to the extent

13   there is a privilege on this issue, it's waived since

14   Mr. McDonald has both testified to giving Mr. Massino

15   instructions yesterday on his direct, and he's previously

16   provided an affirmation to this court as an exhibit to the

17   government motions where he stated exactly what instructions

18   he had given Mr. Massino.

19         MR. ANDRES:  I'm not entirely sure that Mr. McDonald

20   can waive Mr. Massino's privilege.  It seems to me it's

21   Mr. Massino's and not Mr. McDonald's.

22         THE COURT:  Didn't you question him as to that

23   general subject yesterday?

24         MR. ANDRES:  The subjects that were discussed

25   generally relate to do things that were not privileged because

1    they were discussed in an open proffer among other people.

2              Mr. McDonald said that he spoke to Mr. Massino

3    privately at times, but we asked him about questions that

4    were -- that related to whether or not there were comments

5    from the government about whether Mr. Massino would go to the

6    co-defendant meetings.

7              I suppose there was some discussion, and if

8    Mr. Levin can point to something particular in the transcript,

9    but the discussion was about the co-defendant meetings, not

10   his personal conversations with Mr. Massino, unless there is

11   something in the transcript.  We have it.

12             THE WITNESS:  Can I clarify?

13             THE COURT:  Go ahead.

14             THE WITNESS:  At no time yesterday do I believe that

15   I described any private conversations that I had with

16   Mr. Massino.  When I testified about instructions that were

17   given to him, those were instructions that I gave to him in

18   the presence of the agents and the prosecutors.

19             THE COURT:  Why don't we stick to that.

20             MR. LEVIN:  Your Honor, if I may just have a second.

21   I will stick with that to start off with.  I beg to differ

22   with Mr. McDonald's recollection.  I believe he did testify to

23   a discussion he had with Mr. Massino outside the presence of

24   the agents and outside the presence of Mr. Andres, when he met

25   with Mr. Massino to tell him that the U.S. Attorney's office

1   and the Justice Department were going for the death penalty

2   and that his cooperation was no longer going to be accepted.

3            I believe that was a private discussion between

4   Mr. McDonald and Mr. Massino.  To the extent that discussion

5   took place, I submit to this court that is a waiver of the

6   attorney-client privilege.

7            MR. ANDRES:  That is a fact.  That is reported in

8   every newspaper.  That didn't require any legal advice from

9   Mr. McDonald to tell Mr. Massino that he wasn't going to

10  cooperate.  Mr. Massino already knew it because Mr. Massino

11  had already been told in open court that the government was

12  seeking the death penalty, so that clearly does not involve

13  any legal advice whatsoever.

14           MR. LEVIN:  I believe the door has been opened.

15           THE COURT:  Why don't you go ahead and ask him about

16  what he said to Mr. Massino in the meetings.

17  BY MR. LEVIN:

18  Q    Mr. McDonald, going back to August 3rd, the first proffer

19  session when you were present with Assistant United States

20  Attorney Andres and the FBI, what were the first instructions

21  that you gave Mr. Massino?

22  A    I don't remember the first instructions that I gave him.

23  If you're talking about instructions with respect to what he

24  would reveal to the government, I think probably the first

25  thing I told him was that he should not reveal anything

1    concerning the indictment that was pending against him.

2    Q    Did you discuss with Mr. Massino any concerns about what

3    he could or could not talk about in terms of his codefendants?

4              MR. ANDRES:  Objection.

5    A    We had --

6              MR. ANDRES:  Objection.

7              THE COURT:  I'm sorry.  When was this?

8              MR. LEVIN:  August 3rd, your Honor.

9              THE COURT:  This is August 3rd, in the meeting with

10   the government?  Or is this a private meeting?

11             MR. LEVIN:  This is the government's proffer session

12   with the U.S. Attorney, the agents, Mr. McDonald, and Mr.

13   Massino.  It is not a private meeting.

14             THE COURT:  All right.

15   A    As I testified yesterday, at the end of that first

16   proffer session, Mr. Massino actually asked a question of the

17   agents and the prosecutor or prosecutors, I don't remember how

18   many prosecutors were present, and me, should I attend --

19   should I continue to attend co-defendant meetings, and we --

20   you know, we short of chuckled, because it hadn't occurred to

21   us that this could be an issue, and I instructed him, in the

22   presence of the agents, that I thought that -- I said to him

23   that he should continue to attend the co-defendant meetings

24   and that -- and the primary reason for that is one of safety;

25   that if he did not attend the meetings that it would send a

1  signal to anyone who was familiar with his absence that he

2  could be cooperating with the government.

3          In addition, he had pending against him the charges

4  for which he was attending -- or the charges for which he was

5  attending the co-defendant meetings, and since he had no

6  cooperation agreement, and at that point we didn't know

7  whether there it was an indication that he would have that

8  cooperation agreement --

9          THE COURT:  Try to speak slowly because I have to

10  absorb it.

11          THE WITNESS:  He had to continue to prepare a

12  defense in that case for which he had been indicted.  So that

13  was explained to him, that it was important that he continue

14  to attend the co-defendant meetings, but he was admonished by

15  me and also by Mr. Andres that he was not to reveal anything

16  to the government about what happened at the co-defendant

17  meetings.

18  Q    Now, other than that instruction, that he was not to

19  reveal anything about the co-defendant meetings, there were no

20  further instructions given to Mr. Massino on that date; is

21  that correct?

22  A    Yes.  No, that is not correct.  He was also told, both by

23  me and by the prosecutor or prosecutors, again I don't

24  remember whether Mr. Feldman was present -- certainly.

25  Mr. Andres was present -- he was told words to the effect that

1  he was not to be a spy in the enemy camp.  He was not to seek

2  to elicit any information from anyone at the MCC or the MDC,

3  where he was housed at the time, concerning any pending

4  criminal cases or any criminal charges against anyone at the

5  MCC or anywhere else who might come into contact with him

6  while he was incarcerated.

7  Q    The words "spy in the camp," those are your words, those

8  weren't the instructions specifically given literally to

9  Mr. Massino at the August 3rd proffer session, am I correct,

10  sir?

11  A    I think it's quite likely that when I explained to him

12  the reasons for why he was not to be gathering evidence about

13  pending criminal cases, I probably used the expression "spy in

14  the enemy camp."

15  Q    You did?

16  A    I probably did.  I'm not sure whether I did or I didn't.

17  Q    Mr. McDonald, do you recall reviewing actually an

18  affirmation on October 26, 2005, in which you attached your

19  signature.

20          MR. LEVIN:  Your Honor, I'm going to approach the

21  witness and provide him with a copy of it.  I also have a copy

22  on the screen, but I can't get the whole affirmation on it.

23          THE COURT:  Do you have it on your screen now?

24          MR. LEVIN:  He has page two.  I want him to see the

25  whole document. (Handing.)

1          MR. ANDRES:  Just for the record, this is Government

2    Exhibit I, what was previously admitted yesterday.

3          THE COURT:  Thank you.

4    Q    Let me know when you're ready, Mr. McDonald.

5    A    I'm ready.

6    Q    Mr. McDonald, having reviewed that affirmation, is that

7    your signature on the bottom?

8    A    Yes.

9    Q    Of Government Exhibit I?

10   A    Yes.

11   Q    Did you prepare that affirmation yourself?

12   A    I participated in its preparation.

13   Q    You did.  You actively participated in the preparation of

14   that affirmation?

15   A    Yes.

16   Q    I direct your attention to paragraph two.  I'd like to

17   ask you a question after you have had an opportunity to read

18   Government Exhibit I, of paragraph two, page two.

19          (Pause.)

20   A    All right.

21   Q    Mr. McDonald, is it fair to say that the only statement

22   as to instructions to Mr. Massino given in your affirmation

23   stated, quote, that he was not to disclose to the government

24   any information that he obtained during the meetings with his

25   co-defendants and counsel, end quote; is it fair to say that

1    that is the only thing that you had put in your affirmation on

2    October 26th?

3    A    Well, there are six paragraphs.  You're just focusing on

4    one sentence in paragraph two, so there were a number of

5    things that were said.

6    Q    There are a number of things that were said, but in terms

7    of the instructions that you gave your client on August 3,

8    2004, I submit to you that paragraph two is the only paragraph

9    which deals with the instructions that you gave to

10   Mr. Massino.  Is that true?

11   A    I'd have to read the thing over -- I have to read the

12   affirmation over in some detail.  I think the affirmation

13   speaks for itself.

14   Q    I would take a minute and allow you to read the

15   affirmation.

16   A    Can you repeat the question?

17   Q    The question is, is it not a fact that the only

18   instructions you gave to Mr. Massino on August 3rd of 2004

19   appear in paragraph two of that affirmation?

20        I would ask that you take whatever time you need to

21   read your affirmation.

22   A    I can tell you that the answer is to that is more.  I did

23   give him additional -- if you're asking me whether the

24   instructions about him not being a spy in the enemy camp and

25   gathering information outside of co-defendant meetings is

1  contained in the affirmation, the answer to that is yes, if

2  that's what you're getting at.  That is not -- it is not

3  included in the affirmation.

4  Q    All right.  So when you stated in your affirmation at

5  paragraph two that Mr. Massino was instructed not to disclose

6  to the government any information that he obtained during

7  co-defendant meetings with co-defendants and counsel, that is

8  the extent of the instructions that you referred to in your

9  affirmation of October 26th, correct, sir?

10 A    They are the only instructions that I described in my

11 affirmation.

12 Q    Okay.

13 A    In this affirmation.

14 Q    When you were in the process of preparing this

15 affirmation, were you advised what the purpose of the

16 affirmation was?

17 A    Yes.

18 Q    And you knew that that affirmation would be used to

19 prevent Mr. Basciano from obtaining a Messiah hearing,

20 correct?

21 A    I don't think I focused on the purpose of the motion or

22 the -- I understood I was asked to prepare an affirmation in

23 connection with -- in order to address what happened with

24 respect to what instructions were given with respect to the

25 co-defendant meetings.

1    Q    You were asked to prepare an affirmation as to what

2    instructions were given at the co-defendant meetings?

3    A    What instructions were given as to how Mr. Massino should

4    respond to what happened, or should -- let me rephrase this.

5         I was asked to focus on what was said to Mr. Massino

6    with respect to co-defendant meetings and how he should behave

7    with respect to information that he received at co-defendant

8    meetings.

9    Q    And that information was for security purposes, if I

10   understood your testimony; correct?

11   A    For security purposes and so that he could continue to

12   prepare his defense.

13   Q    Correct.  My point being, when you advised Mr. Massino to

14   continue to attend co-defendant meetings, in your mind that

15   was so that Mr. Massino would not appear as an informant; is

16   that correct?

17        MR. ANDRES:  Objection.  The question has been asked

18   six times now.  Mr. McDonald said it was for protection and

19   because he had a pending case.  No matter how many different

20   ways Mr. Levin phrases it, it's the same question.  It has

21   been asked and answered and I object.

22        MR. LEVIN:  I would appreciate if Mr. Andres would

23   just say he objects instead of testifying.

24        THE COURT:  We don't have a jury here.  You can all

25   give speeches, you're capable of it I know.

McDonald - cross/Levin                                    220

1            Is there anything you have to add to what you

2    already said with respect to the question that has just been

3    put to you?

4            THE WITNESS:  No, your Honor.

5            THE COURT:  Next question.

6    BY MR. LEVIN:

7    Q    I believe yesterday, Mr. McDonald, when you arrived

8    before the hearing started, there was colloquy between

9    yourself, myself, Mr. Andres and Judge Garaufis, correct,

10   concerning the response to the subpoena?

11   A    Yes.

12   Q    And in the course of that colloquy you stated that you

13   had obtained information about Mr. Basciano as early as

14   August 3rd; is that correct?

15   A    I'm not sure whether that's correct.  I know that the --

16   Q    Let me ask you this.  You have notes from your proffer

17   session on August 3rd, do you not?

18   A    Yes.

19   Q    And those notes contain attributions concerning

20   Mr. Basciano; correct?

21   A    I don't think so.  I don't think on August 3rd.

22   Q    What about on September 21st?

23   A    I'm not sure of the dates of the notes.  My notes contain

24   references to Mr. Basciano, but I'm not sure of the dates on

25   which the notes were recorded.

1          MR. ANDRES:  I would objected to this line of

2     questioning.

3          THE COURT:  I have already ruled on this.  Next

4     question.

5          MR. LEVIN:  For the record.

6     Q    If you had your notes in front of you, would it refresh

7     your recollection as to the date?

8          MR. ANDRES:  Objection, Judge.

9          THE COURT:  Sustained.

10    Q    Mr. McDonald, we have the proffer session of August 3rd,

11    correct, you attended that; correct?

12    A    Yes.

13    Q    We have proffer sessions on September 21, 22 and 23, I

14    believe you testified yesterday; correct?

15    A    I'm not sure whether I was precise in describing the

16    dates, but there were three days in late September.

17    Q    Other than those four proffer sessions, were there any

18    other proffer sessions in regard to Mr. Massino with the

19    United States government and yourself present, prior to

20    December 10th?

21    A    No.

22    Q    So we have those four proffer sessions, we have

23    August 3rd -- three days in September and August 3rd, we have

24    that, correct?  Those are the four proffer sessions prior to

25    December 10th?

1   A    I'm trying to think whether -- you know, I'm trying to

2   think whether we had another proffer session at some point.  I

3   believe we had the proffer sessions on the three consecutive

4   days in the latter part of September, and I did not meet with

5   him again until the 22nd of November, and --

6   Q    May I stop you there a for a second?

7   A    Yes, on that date we did not have a proffer session.

8   Q    When you saw him on November 22nd -- my followup

9   question -- was anybody else present besides you and

10  Mr. Massino?

11  A    I met privately with him, but then representatives of the

12  government joined us after I met privately with Mr. Massino.

13  Q    So on November 22nd, yourself and representatives of the

14  government had a meeting with Mr. Massino?

15  A    Yes.

16  Q    November 22nd, the day before Mr. Massino had to be in

17  court; correct?

18  A    I'm not sure when he had to be in court.  I think it was

19  the Monday before Thanksgiving was when I met with him.

20  Q    Now, on November 22nd, I believe you testified to

21  yesterday that that was your first opportunity to meet with

22  Mr. Massino subsequent to you learning that the Justice

23  Department had decided to go ahead with the death penalty; is

24  that correct?

25  A    Yes.

1   Q     And you met with Mr. Massino on November 22nd and you

2   informed him that they were going to go forward with the death

3   penalty; is that correct?

4   A     He already knew that.

5   Q     How did he already know that?

6   A     I believe it had been revealed in court when he -- when

7   he came to court sometime around the 12 or 13 of November.  I

8   think it was publicly revealed in the courtroom that day:  And

9   I was not there, I was not representing him in court.

10  Q     What was the purpose of having the government attend your

11  meeting on the 22 with Mr. Massino if in fact the government

12  had already informed you they were no longer interested in him

13  as a cooperator?

14  A     The government told me that they were willing to explore

15  with their superiors in Washington the possibility of having

16  the death penalty lifted if he pleaded guilty to the

17  indictment that was pending against him and he withdrew his

18  appeal on the previous RICO case in which he had been

19  convicted.

20  Q     So there was still interest by this office, the Eastern

21  District U.S. Attorney's office, to work with Mr. Massino, is

22  that a fair statement?

23  A     No.  It was understood that his cooperation would not be

24  accepted, and basically they were looking to save time.  That

25  is, they wanted to avoid going to the -- basically the

1    expense, the time and effort to try him on the pending case

2    and they wanted to avoid having to prepare an appeal in

3    response to whatever appeal he might file in connection with

4    the first case in which he had been convicted.

5    Q    The meeting that you attended with Mr. Massino, which

6    later was attended by the government, how long did that last

7    on the 22?

8    A    Maybe an hour and a half, an hour.

9    Q    An hour and a half?

10   A    Well, I think the entire time I was -- you know, at the

11   building where the meeting took place, probably was no more

12   than an hour and a half, two hours.  So that included the time

13   I spent with him privately and the time I met with him and the

14   prosecutors and the agents.

15   Q    Well, what specific instructions were given to

16   Mr. Massino on November 22nd concerning what he should or

17   should not do going forward in regard to his ability to

18   continue to meet with his co-defendants?

19           THE COURT:  I'm sorry.  By whom?

20           MR. LEVIN:  I'll withdraw it.  I'll rephrase, your

21   Honor.

22   Q    On November 22nd, in the presence of the government, what

23   specific instructions were given to Mr. Massino by either

24   yourself or the government concerning how he should deal with

25   his co-defendants going forward?

McDonald - cross/Levin                          225

1    A    I don't remember what -- whether any instructions were

2    given to him.  It was understood that he was not going to be

3    cooperating with the government.

4    Q    You say it was understood.  Was that your understanding

5    or was that Mr. Massino's understanding?

6    A    Well, the government told us, when Mr. Massino and I were

7    sitting there, that in view of -- in light of the instruction

8    or direction that they had gotten from their superiors in

9    Washington, that his cooperation would not be accepted.  So

10   they told us that.

11        So it was clearly my understanding, I think that the

12   language or the words spoke for themselves.  The plain meaning

13   was that his cooperation was unacceptable, it was not going to

14   be accepted by the Justice Department.

15   Q    However he was also told, correct me if I'm wrong, you

16   just testified that he also, if he was willing to withdraw his

17   appeal and plead guilty, that they would consider continuing

18   him to cooperate?

19   A    No, absolutely not.

20   Q    What was the purpose of -- I'm sorry, what benefit did

21   Mr. Massino have in withdrawing his appeal and pleading guilty

22   to the Sciascia murder if he was not going to receive some

23   consideration for cooperation?

24   A    The consideration that he would be given would be that

25   the prosecutors in New York would go to Washington and request

McDonald - cross/Levin                      226

1    that the Attorney General's office withdraw their insistence

2    that he be executed.

3    Q    That was the extent?

4    A    Yes.  Just to be clear.  There was no agreement that this

5    would happen, and the prosecutors in the Eastern District did

6    not say that they were agreeing to it.  It was a proposal that

7    they were throwing out to see whether this would be something

8    that Mr. Massino would consider and whether it would be

9    acceptable to him.

10   Q    Did you speak with Mr. Massino from November 24th through

11   December 2nd via telephone, meeting or otherwise, did you ever

12   any communications with your client between November 24th and

13   December 2nd?

14   A    I don't believe so.

15   Q    Between December 2nd and December 10th, did you have any

16   communications with Mr. Massino?

17   A    I don't believe I met him or spoke to him before

18   December 10th, I believe that was the first time I spoke to

19   him after November 22nd.

20   Q    Did Mr. Massino have your office phone number, did he

21   have access to contacting you if he desired to?

22   A    No.

23   Q    Just so I'm clear, your last contact with Mr. Massino

24   prior to December 10th is November 22nd?

25   A    I believe so.

1  Q    What, if any, instructions did you give Mr. Massino on
2  November 22nd concerning his upcoming court appearance on
3  November 23rd?
4  A    I don't remember that --
5           THE COURT:  Is this in the presence of the
6  prosecutors?
7           MR. LEVIN:  Yes.  Fine, we'll start with that.
8           THE COURT:  That's where we're going to end too.
9  A    I don't remember that he had a court appearance on the
10 23, and I don't remember giving him any instructions.
11 Q    What, if any, instructions, Mr. McDonald, did you give
12 Mr. Massino in regard to any future co-defendant meetings on
13 November 22nd?
14 A    I think, as I previously testified, I don't remember
15 giving him any instructions.  I don't think we gave him any
16 instructions, but I don't remember any instructions.
17 Q    Yesterday I believe you testified that there came a point
18 in time on December 10th that Mr. Massino informed you that
19 there had been a threat against a prosecutor?
20 A    That's correct.
21 Q    And did you learn about that on December 10th?
22 A    Yes.
23 Q    Did Mr. Massino tell you where and when he obtained this
24 information?
25 A    Well, I'm not going to --

McDonald - cross/Levin                      228

1    Q    A yes or no answer.

2    A    Just to be clear.  I'm not going to answer any question

3    concerning what my conversation was with Mr. Massino outside

4    the presence of the officials from the government.

5              MR. ANDRES:  Judge, I would object to the substance

6    of Mr. Massino's statements to Mr. McDonald.  Those are not

7    questions that have not been asked at this hearing.  In fact,

8    there have been any number of questions that have been

9    objected to and sustained.  So I object to that.

10             THE COURT:  Sustained.  Next question.

11   Q    What is the first thing you did after you learned there

12   had been a threat against a prosecutor?

13   A    I called Mr. Feldman.

14   Q    And you discussed with Mr. Feldman the sum and substance

15   of the information you had received; is that correct?

16   A    I asked Mr. Feldman to come to the building where I was

17   with Mr. Massino.

18   Q    There was a meeting with Mr. Massino, Mr. Feldman and

19   yourself; correct?

20   A    No, I met first with Mr. Feldman briefly, and I told him

21   the threat that I had been told about, and we were then joined

22   by Mr. Andres, and after we met briefly, after the three of us

23   met briefly, we then went in and met with Mr. Massino, and I

24   think the agents joined us.  One or two agents joined us.

25   Q    So at the point in time where you went in and spoke with

McDonald - cross/Levin                229

1  Mr. Massino with a few agents and Mr. Feldman and Mr. Andres,

2  what was the sum and substance of what Mr. Massino told you in

3  terms of when this threat -- when he learned this threat?

4           MR. ANDRES:  Objection.

5           MR. LEVIN:  This is not a privileged conversation,

6  this is a conversation in the presence of two other assistant

7  United States attorneys and two FBI agents.

8           MR. ANDRES:  It's not a question of privilege,

9  Judge, it's a question of Mr. Massino's statements.  This

10 hearing can take twelve hours if Mr. Levin continues to ask

11 questions that your Honor has sustained.

12          The issue of Mr. Massino's statements is not in

13 question here.

14          THE COURT:  Sustained.

15 Q    Other than -- Mr. McDonald, other than the threat against

16 the prosecutor, there was nothing else discussed at that

17 meeting; correct?

18 A    No.  No, no you're not correct.

19 Q    No, I'm not correct.

20 A    Right.

21 Q    What else was discussed at that meeting?

22          MR. ANDRES:  To the extent that this pertains to

23 other statements by Mr. Massino, I would object.

24          THE COURT:  Can you be more specific about something

25 that is within the subject matter of the Messiah hearing.

McDonald - cross/Levin                    230

1   Q    Did Mr. Massino on December 10th discuss with either

2   yourself -- with yourself, in the presence of Mr. Feldman and

3   Mr. Andres, Mr. Basciano; yes or no?

4              MR. ANDRES:  Objection.

5              MR. LEVIN:  I'll get there, Judge.

6              THE COURT:  You'll get there?  You already got

7   there.

8              MR. LEVIN:  Withdrawn.  I'll rephrase the question.

9   Q    Did Mr. Massino discuss, in the presence of Mr. Andres

10  and Mr. Feldman, Mr. Basciano's prior criminal conduct?

11             MR. ANDRES:  Objection.

12  Q    Yes or no answer.

13             MR. ANDRES:  Objection.

14             THE COURT:  Sustained.

15  Q    Did Mr. Massino discuss any criminal conduct of

16  Mr. Basciano in the presence of yourself and Mr. Andres on

17  December 10th?

18             MR. ANDRES:  Objection.

19             THE COURT:  Sustained.

20  Q    Yesterday I believe you testified -- withdrawn.

21             Do you recall being asked the following question and

22  giving the following answer in yesterday's transcript -- I

23  don't have page numbers on my transcript, your Honor, but I

24  have line numbers.  Commencing at line seven, page 16.

25             THE COURT:  You're saying where?

McDonald - cross/Levin                    231

1          MR. LEVIN:  Page 16.  We're going to start at line

2     four.

3     Q    Do you recall being asked this series of questions and

4     giving these answers:

5          "QUESTION:  Did it involve a threat against a

6     law-enforcement official?

7               "ANSWER:  Yes.

8               "QUESTION:  After you learned of the threat what did

9     you do?

10              "ANSWER:  I called Mark Feldman, the head of the

11    Organized Crime Unit in the United States Attorney's office,

12    and I told him about the threat that Mr. Massino had reported

13    to me.

14              "QUESTION:  Is that the first time you learned about

15    the threat?

16              "ANSWER:  Yes."

17         Do you recall being asked those questions and giving

18    those answers yesterday.

19    A    Yes.

20    Q    Thank you.

21         To go back to my original question.  On

22    December 10th, other than the threat against the prosecutor,

23    did Mr. Massino provide you with any other information

24    concerning ongoing criminal conduct of Mr. Basciano?

25              MR. ANDRES:  Objection.

McDonald - cross/Levin                    232

1      MR. LEVIN:  Your Honor, that would go to the Messiah

2  issue.

3      MR. ANDRES:  How many times is Mr. Levin going to

4  ask that question.

5      MR. LEVIN:  The last question was prior criminal

6  conduct.  I'm asking about ongoing criminal conduct.

7      THE COURT:  Ongoing criminal conduct is not the

8  subject of the Messiah hearing.

9      MR. LEVIN:  That would be the basis that there

10  wouldn't be a violation, but if they are asking about prior

11  conduct, then there is a violation.  I'm just trying to

12  clarify the issues, what was discussed.

13      MR. ANDRES:  Judge, I object.  If any of this

14  relates to whether or not Mr. Massino spoke about the Pizzolo

15  murder, there was clearly testimony about that yesterday as

16  well.  But any other issues with respect to what Mr. Massino

17  said at that hearing are not the subject of this hearing.

18      THE COURT:  Sustained.  If you can ask the question,

19  another question that doesn't run afoul of that, go ahead.

20  Q    Mr. McDonald, was there a subsequent proffer session

21  after December 10th with Mr. Massino, subsequent to the 10th?

22  A    Yes.

23  Q    And would it be fair to say that that proffer session

24  took place on December 22nd of 2004?

25  A    Yes.

1    Q    And was Mr. Massino at that time in your presence

2    informed that the government would make arrangements that he

3    can meet privately with Mr. Basciano?

4    A    No.

5    Q    Well, on December 22, 2004, was there a discussion

6    between yourself, Mr. Massino and the government about

7    Mr. Massino wearing a wire for the government?

8    A    Yes.

9    Q    And there came a point in time that Mr. Massino agreed to

10   do that; correct?

11   A    He agreed to do it on the -- at least on the 22nd he

12   agreed to do it.  The government didn't agree that they would

13   let him do it on the 22nd.

14   Q    When he was told -- when he was asked to wear a wire, was

15   he instructed by yourself how he should conduct himself when

16   he meets with Mr. Basciano?

17            MR. ANDRES:  Objection.  Mr. McDonald instructions

18   are not at issue here.

19            THE COURT:  Sustained.

20            MR. LEVIN:  Your Honor, Mr. McDonald has given an

21   affirmation as to how he instructed Mr. Massino in conjunction

22   with the government.

23            He truly wasn't working as a private attorney in

24   this particular situation, he was working in conjunction with

25   the government.  It's obvious that he's the one that is

1    suggesting that Mr. Massino wear the wire.

2              MR. ANDRES:  That's absurd.

3              THE COURT:  That's not what I appointed him to do.

4    I appointed him to represent Mr. Massino, not to represent the

5    government.

6              MR. LEVIN:  You may have in fact appointed him to

7    represent Mr. Massino, but Mr. McDonald, being a skilled

8    attorney that he is, is the one that came up with the idea

9    that Massino should wear a wire.  That is something that is

10   for the benefit of the government.

11             MR. ANDRES:  Mr. McDonald is not here to be insulted

12   by these questions that are --

13             MR. LEVIN:  I'm not trying to insult Mr. McDonald.

14             THE COURT:  I know you're trying to do your job.

15             MR. LEVIN:  Exactly.

16             THE COURT:  I'm not delineating your comments with

17   any kind of pejorative connotation.  I just made a ruling.  I

18   want to move on.

19             MR. LEVIN:  Yes, your Honor.

20             THE COURT:  Mr. McDonald I'm sure has heard worse.

21             THE WITNESS:  I don't take it as an insult, Judge.

22             THE COURT:  Good.  Next.

23   Q    Subsequent to December 22nd, did you meet with

24   Mr. Massino again prior to January 3rd of '05?

25   A    No.

Case 1:03-cr-00929-NGG  Document 1185  Filed 09/10/13  Page 31 of 132 PageID #: 13707

1  Q    The last time you saw Mr. Massino was on December 22nd of

2  '04, prior to the January of '05; is that correct?

3  A    That's right.

4  Q    Did you have any communication with Mr. Massino between

5  December 22nd of '04 and January of '05 by telephone?

6  A    No.

7  Q    Did you give him any instructions in writing?

8         MR. ANDRES:  Objection.

9         THE COURT:  Sustained.

10  Q    So the last time you saw Mr. Massino is December 22nd,

11  and he agreed to wear a wire; is that correct?

12  A    The last time when, last time before when?

13  Q    December 22nd of '04, prior to January 3rd of '05 was the

14  last time you had a face-to-face meeting with Mr. Massino;

15  correct?

16  A    I spoke to Mr. Massino on the 22nd face-to-face, and I

17  did not see him or speak to him again until the 25 of January,

18  2005.

19  Q    So on the 22nd, when he agreed to wear a wire, were you

20  present -- this is a different question -- were you present

21  when Mr. Massino received any instructions from the government

22  on how he should conduct himself once he wore that wire and

23  met with Mr. Basciano?

24  A    To be clear, it was not agreed that he would wear a wire

25  because an agreement requires two parties reaching an

1    agreement or an understanding.

2            Mr. Massino offered to wear a wire.  I urged the

3    government to permit him to wear a wire.  The government did

4    not commit themselves to allowing or permitting.

5    Mr. Basciano to wear a wire --

6            THE COURT:  Mr. Massino.

7            THE WITNESS:  Excuse me -- Mr. Massino to wear a

8    wire, and they said that it was something that they would

9    continue to consider.

10   Q    Well, you were his attorney; correct?

11   A    Yes.

12   Q    And you were the person that was responsible for advising

13   him on what to do or whatnot to do in terms of his

14   predicament; correct?

15   A    That's correct.

16   Q    You don't see him again until January 25th; correct?

17   A    That's correct.

18   Q    You last see him on December 22nd?

19   A    That's correct.

20   Q    Did the government contact you at some point in time and

21   say Mr. Massino is going to wear a wire, we're going to see

22   him and discuss it with him?

23   A    Yes.

24   Q    And when did that happen?

25   A    I'm not sure of the date.  It was some date before that

1    he recorded the conversation, the first conversation with

2    Mr. Basciano.

3    Q    Did you discuss with the government what instructions

4    they were going to give Mr. Massino and how he should comport

5    himself when he met Mr. Basciano?

6               MR. ANDRES:  Objection.

7               THE COURT:  You may answer.

8    A    No.

9    Q    So you were never advised as to what the government told

10   your client in terms of how he should conduct himself when he

11   meets Mr. Basciano; is that a fair statement?

12   A    Yes.

13   Q    A little bit more.  I'm almost done.

14              Mr. McDonald, did you give an interview to the

15   American Lawyer Magazine in October of '05?

16              MR. ANDRES:  Objection.

17              MR. LEVIN:  This is cross-examination, your Honor..

18              MR. ANDRES:  Not remotely relevant to what the

19   government's conduct was.

20              THE COURT:  An offer of proof.  What is this about?

21              MR. LEVIN:  Your Honor, Mr. McDonald gave an

22   interview to American Lawyer Magazine where he discussed his

23   relationship with Mr. Massino, whether he felt that

24   Mr. Massino, conducting himself in a dual role as a defendant

25   and informant, violated Mr. Basciano's rights and, most

McDonald - cross/Levin                                  238

1   importantly, I believe that interview waives the

2   attorney-client privilege when he gave an interview concerning

3   what he told Mr. Massino, what Mr. Massino responded to him,

4   and disseminated that to the reading public of American

5   Lawyer.

6           MR. ANDRES:  First of all, you have that article

7   because it was produced as a Government Exhibit in our

8   submission.  Second of all, while I'm sure that Mr. McDonald's

9   legal reasoning is well founded, it's not particularly

10  relevant here because he's not the judge, and what Mr.

11  McDonald thinks about whether or not Mr. Basciano's rights

12  were violated is really not of any interest.  That's an issue

13  for you to decide.

14          I also think that that is not a particularly

15  accurate description of what Mr. McDonald said.  I think what

16  he says is words to the effect of I don't want to go into that

17  area, or no comment.  He certainly didn't say that

18  Mr. Basciano's rights were violated, but we can clear that up

19  very easily by having your Honor read that.

20          But that is most irrelevant to the government's

21  conduct and what the government did either -- in the court's

22  words -- to exploit the situation with Mr. Basciano for the

23  purposes of obtaining information, or the government's

24  instructions to Mr. Massino with respect to what he could and

25  couldn't say.  That is what this is hearing is about.

McDonald - cross/Levin                    239

1          MR. LEVIN:  Your Honor, if it please the court, I
2    have extra copies of the article.  I can provide it to the
3    court and when you ask for my offer of proof, I can direct you
4    to the particulars.  It might maybe it easier than just
5    talking.
6          (Pause.)
7          THE COURT:  All right.  Let's start with the waiving
8    of the privilege.  Where did he waive the privilege?
9          MR. LEVIN:  Your Honor, the first issue --
10         THE COURT:  It's not his to waive, but go ahead.
11         MR. LEVIN:  Well, the first issue is, when one looks
12   at the first page of the article, the first question -- the
13   last question on the first page:
14         "QUESTION:  You first met Massino in the judge's
15   chambers in July 2004.  What did he say when he saw you?
16         "ANSWER:  He said 'it's my lucky day.'  He laughed."
17   That --
18         THE COURT:  What does that do?
19         MR. LEVIN:  Your Honor, he's disclosing his
20   communication with Mr. Massino in the privacy of your chambers
21   to the public.
22   A    The judge was present when he said that.
23   Q    I'm sorry?
24   A    The judge was present when he said that.
25         THE COURT:  And the matter was placed on the record.

McDonald - cross/Levin                    240

1   Nothing happened in my chambers with Mr. Massino without a

2   court reporter present.

3            MR. LEVIN:  I understand, your Honor.  That is not

4   the issue.

5            THE COURT:  I just sealed it because of the nature

6   of the proceedings.  But it was a proceeding in court

7   involving a convicted felon and everything that I did was done

8   on the record.

9            MR. LEVIN:  I'll move on.  Fair enough.

10           THE COURT:  It wasn't a privileged communication.

11  Q    I'll move on.  Mr. McDonald, in the course of that

12  interview you gave answers to a series of questions, did you

13  not?

14           MR. ANDRES:  I'm sorry?

15           THE COURT:  Move on with me first before you move on

16  with him.  What here waives the privilege?

17           MR. LEVIN:  Your Honor, I thought that statement

18  waived the privilege.

19           THE COURT:  No, that doesn't do it.

20           MR. LEVIN:  Your Honor has ruled against me.

21           THE COURT:  Why should I pay any attention to this

22  whatsoever?  How does this advance our wisdom?

23           MR. LEVIN:  I have two more questions and I'm

24  finished with Mr. McDonald -- maybe one more question.

25           MR. ANDRES:  It doesn't matter if he has one more

1    question or 400, if the document and the subject matter isn't

2    relevant he doesn't get to ask it.

3              THE COURT:  Is it this document?

4              MR. LEVIN:  I'm going to ask him a question.  It's

5    not about the document.  I'm going no ask him a straight

6    question.

7              THE COURT:  Go ahead.

8              Sit down, Mr. Andres.  Next question.  Go ahead.

9    BY MR. LEVIN:

10   Q    Mr. McDonald, you have been a practicing attorney for

11   35 years; correct?

12   A    Yes.

13   Q    I believe yesterday you testified that you're a very

14   experienced former federal prosecutor, correct?

15   A    I don't think I said very, but I am -- I would think that

16   I would qualify as an experienced, and probably very

17   experienced criminal defense lawyer.

18   Q    Thank you.  Do you believe that Mr. Massino violated

19   Mr. Basciano's constitutional rights?

20             MR. ANDRES:  Objection.

21   Q    When he met with him?

22             THE COURT:  Sustained.

23             MR. LEVIN:  Nothing further, your Honor.

24             THE COURT:  All right.  Is there anything from the

25   government?

242

1              MR. ANDRES:  No, Judge.

2              THE COURT:  All right.  Mr. McDonald, you are

3    excused.  You may stand down.  Have a nice day.

4              THE WITNESS:  You too.

5              (Witness excused.)

6              MR. LEVIN:  Your Honor, I have no further points on

7    this matter.

8              THE COURT:  Does the government have any more

9    witnesses?

10             MR. ANDRES:  No, Judge.  We rested yesterday.

11             MR. LEVIN:  Your Honor, yesterday the government

12   asked for a good-faith basis as to why I wanted to question

13   about January 3rd.

14             In response, I provided the government and the court

15   with a letter where I quoted from Mr. Massino talking about

16   how he said he talked about everything on November 23rd.

17   Mr. Andres pointed out to the court that that doesn't mean

18   that they talked about on January 3rd, that they talked about

19   indicting criminal conduct of Mr. Basciano, specifically,

20   gambling and Santoro, things of that nature.

21             Today I'd like to provide to the court the specific

22   references of Mr. Massino questioning Mr. Basciano about his

23   charged conduct.  I'm quoting from the January 3rd transcript.

24             I have to apologize to the court because I'm in a

25   hotel room, my printer and the rest of my files haven't

243

1  arrived, so I was unable to print out copies, but I see that

2  Mr. Andres does have a set.

3           MR. ANDRES:  Which one, January 3rd?

4           THE COURT:  Which exhibit is this?

5           MR. LEVIN:  January 3rd.

6           MR. ANDRES:  It's not an exhibit.

7           MR. LEVIN:  It's not an exhibit from this hearing,

8  but it's an exhibit to the initial motion papers, the

9  government's exhibits in the Messiah issue.

10           MR. ANDRES:  We actually didn't include that.  Out

11  of an excess of caution, we didn't disclose the --

12           MR. LEVIN:  If the court would allow me to read the

13  three excerpts, and I would provide my copy to the court.

14           MR. ANDRES:  I would object on the grounds that what

15  Mr. Massino is saying in January is of no relevance to the six

16  weeks prior to that where the Messiah issue is ripe.

17           The court's opinion specifically states that

18  anything that was said after December 29th or that time period

19  certainly, the time period of the tapes, is completely

20  irrelevant.

21           MR. LEVIN:  It's not irrelevant, your Honor.

22           THE COURT:  Let me hear it.

23           MR. LEVIN:  Thank you, Judge.  We start off at page

24  64, that quote I gave to the court yesterday.

25           Massino:  No.  But you see what you're saying, let

1   me -- if I'm wrong correct me.  I see you on Friday in the

2   bullpen, correct?

3                DEFENDANT BASCIANO:  Go ahead.

4                Massino:  We talked about everything, right?

5                Basciano:  Right, right, right.

6                Massino:  You never mentioned a word about Randy.

7                Basciano:  Well, you know what I --"

8                So that's what I gave the court yesterday, that's

9   where it starts, that is page 64.  Now we come down to page --

10               THE COURT:  That conduct is charged conduct?

11               MR. LEVIN:  I'm going to show the court why it's

12  charged conduct right now.  I'm going to another attribution

13  where he comes out and asks him about Santoro, and Santoro is

14  the exact homicide that Mr. Basciano is already under

15  indictment for at the time.

16               THE COURT:  But Pizzolo was enough because he was

17  killed by December 1, 2004?

18               MR. LEVIN:  That's correct.

19               THE COURT:  Go ahead.

20               MR. LEVIN:  Where this is going, and -- your Honor

21  is going to have a surgical procedure here.  There will come a

22  point in time where you have to decide what he can and can't

23  testify to because there is violation of Messiah within their

24  investigative technique.

25               If your Honor finds their investigative technique

245

1    was proper -- I submit it was not, but if your Honor were to

2    so find it was proper, you still have to deal with parts of

3    their technique that violated his rights.

4          THE COURT:  I'm sure you'll point those out.

5          MR. LEVIN:  I'm starting to.

6          MR. ANDRES:  It's absurd.  We're not admitting the

7    tapes, nothing from these tapes or the time -- there is no

8    surgery, no Band-Aid, no medical procedures involved, nothing

9    from that time is relevant.

10         MR. LEVIN:  This has nothing to do with the tapes,

11   it has to do with the information the government learns as a

12   result of the tapes that allow them to further boost their

13   case against Mr. Basciano in this upcoming trial.

14         Your Honor's own decision speaks of that where he

15   talks -- where your Honor grants the hearing for the

16   conversations that were not on tape.  But I'm bringing this

17   out not so much because it's on tape but it refers back to the

18   time period where they talked previously.

19         MR. ANDRES:  Just so we're clear.  The prior

20   conversation, prior to the time that Mr. Basciano was in jail

21   relating to a time when Mr. Basciano was in the street and

22   Mr. Massino was in the street and Mr. Basciano told

23   Mr. Massino that they killed Frank Santoro, that he used a

24   shotgun, that Dominick Ciccale used another firearm, and he

25   gave the specifics.

246

1          So it was a conversation well before anytime these

2   two men are jail between Basciano and Massino about Basciano's

3   use of a shotgun to kill Frank Santoro.  So the notion that we

4   would be probing that area when they are in jail is silly

5   because --

6          MR. LEVIN:  Can I continue?

7          MR. ANDRES:  There are statements and admissions

8   about that well before the time they were in jail.

9          THE COURT:  Let me hear from Mr. Levin to make a

10  complete record.

11         MR. LEVIN:  Page 77.  It actually -- it starts on

12  page 66 -- 76.

13         Basciano:  Yeah, yeah, yeah, right, right, right.

14  He's a dope, he's a dope.  I hope he don't get pinched, no."

15         They're talking about Bruno Indelicato.  Massino

16  goes:  Huh.  I think he might get pinched.  He's gonna get

17  pinched you think for what?

18         Basciano:  On the papers it says me, Bruno and a

19  correction officer with that homicide.  Says me, Bruno, and a

20  correction officer.  I denied it three or four times.  There's

21  another tape out there that Tony Urso told Louie, Louie asked

22  Tony about the shot gunning and Tony went back to him and says

23  Vinnie has nothing to do with it.  I'm gonna beat the murder.

24  All right.  Good."

25         THE COURT:  I'm sorry, who is saying this to whom?

247

1           MR. LEVIN:  Basciano is responding to Massino when

2      Massino is asking the question why is Bruno going to get

3      pinched?  It's in reference to the Santoro murder.

4           Your Honor may find this not to be that strong, but

5      as your Honor said, I can make the record.

6           THE COURT:  I didn't say that.  Is there a look on

7      my face?  I'm listening and trying to understand who is saying

8      what to whom.

9           MR. LEVIN:  I completely understand.  I feel.

10     Mr. Andres breathing down my neck as I'm speaking.

11          THE COURT:  One at a time.  I'm first.

12          MR. LEVIN:  Yes, your Honor.

13          THE COURT:  You didn't give me a copy of the

14     transcript so it's hard for me to read along when I have

15     nothing to read.

16          Go ahead.

17          MR. LEVIN:  Commencing on page 53.  Massino:  I

18     never heard of it but they kept it for themselves.  In the

19     meantime Joe paid.

20          Basciano: The other guy told me, Oh, in Jersey,

21     there's a Cadillac place in Jersey with Big Louie."

22          Going over to page 54 at the top.  "I know nothing

23     about it.

24          Basciano:  The big Cadillac place, where there's a

25     big Cadillac place in Middleton, New Jersey.

248

1          Massino:  What's happening in Jersey with the

2     machines?"

3          I submit to your Honor he's asking him now about the

4     Joker Poker business, charged conduct in the O3 indictment.

5          Basciano:  They're in there, they're there.  They

6     have been there for weeks now.

7          Massino:  All right.  All right.

8          Basciano:  Oh, this is like with the machines, Sally

9     Daz guys,  Sally Daz put the machines in.  300 a week goes to

10    Sandy.  You said you were aware of that, am I correct or not?

11    I split 150 with him and TG, and then the other half.

12         Massino:  I did that?"

13         Then the rest of this conversation goes on about the

14    money and then it goes into some other activities with Tommy

15    Lee.

16         MR. ANDRES:  Judge --

17         THE COURT:  Go ahead.

18         MR. LEVIN:  My point, your Honor, is that those

19    three attributions where Mr. Massino is asking questions of

20    Basciano deal with charged conduct and those attributions.

21    Specifically this tape here allows the government then to go

22    subpoena Sally Daz.  I don't know what the gentleman's real

23    last name is, I apologize --

24         MR. ANDRES:  Salvatore Zattola, a long-time criminal

25    associate of Mr. Basciano.

1          MR. LEVIN:  Thank you.  It allowed them to develop

2     the charge.  If there's a Messiah violation -- we'll have to

3     brief it further when the time comes -- that type of

4     information would have been the result of a Messiah violation

5     and the government should not be entitled to use it at trial.

6     They should not be entitled to develop their investigation off

7     these tapes concerning charged conduct.  That's where I'm

8     going with this.

9          MR. ANDRES:  Judge, it's double talk at best.  First

10    of all, they're talking in January of 2005 about an indictment

11    that doesn't go into January 2005.  So Mr. Massino can't be

12    talking about charged conduct because we couldn't have charged

13    the conduct up will that day.

14          They are talking about Mr. Basciano involved in

15    present criminal activity from the time that he's in jail with

16    Joe San Martino, a soldier in the Bonanno family, now a

17    captain, who operates a Joker Poker machine --

18          THE COURT:  They are talking about the current

19    business?

20          MR. ANDRES:  Mr. Massino is hardly questioning about

21    it.  It's coming out from Mr. Basciano.  The stuff from

22    Salvatore Zattola comes out well before this time.  We didn't

23    instruct Mr. Massino -- to be honest with you, I have no idea

24    what instructions were given, I wasn't part of that.  It's not

25    relevant to anything.

250

1          If Mr. Massino testifies about Sally Daz, Salvatore

2     Zattola, that would be from independent knowledge of Salvatore

3     Zattola.  Aside from that, there are several other witnesses

4     who are well aware of Salvatore Zattola --

5          THE COURT:  It might be that Mr. Massino will not be

6     permitted, if I'm convinced that the conversation had to do

7     with the period of charged conduct.

8          MR. ANDRES:  No question.  If this is all

9     Mr. Massino knows about Sally Daz, then absolutely.

10          MR. LEVIN:  Those are the extent of the

11     attributions.  I don't have more than that.  What I'll do is

12     call my office and give you a complete transcript overnight if

13     your Honor needs it for this purpose.

14          THE COURT:  I'm sure I have it somewhere.  I have

15     everything.  It was submitted by the government.

16          MR. LEVIN:  At this step, I'm asking the court to

17     allow us to bring Massino in and cross-examine him concerning

18     the instructions he received, his interpretation of those

19     instructions and what he did with those instructions.

20          As your Honor stated in his opinion, this hearing is

21     about the testimony, Massino's testimony as to the unrecorded

22     conversations.

23          In your Honor's decision, your Honor acutely points

24     out in following the Molton line of reasoning that there's an

25     exploitation if the government creates the opportunity, and it

1  is my position that the government has created the opportunity

2  here.  They try in their prophylactic way to say that

3  Mr. Massino was instructed on August 3rd not to discuss this

4  case with defendants at the co-defendant meeting.  Then, to

5  further protect themselves, they, in a vain attempt to

6  succeed, they try to get the agent to say they also instructed

7  him in a general way not to talk to the individuals.

8          You'll have the testimony to review.  Agent

9  McCaffrey contradicts herself.  At one point she says she

10  instructed him one way, at another point she says she

11  instructed him as to the individuals as well.

12          You have Mr. McDonald, you have Mr. McDonald's

13  affirmation which contradicts what he said on direct.  You

14  have the failure of recollection, the specifics on cross.  The

15  only way to resolve this issue is to hear from Mr. Massino --

16          THE COURT:  No.

17          MR. LEVIN -- in my opinion.

18          THE COURT:  First of all, I have Mr. Basciano's

19  affidavit, but Mr. Basciano is available to testify.  It

20  doesn't violate his constitutional right not to testify at

21  his -- regarding testifying at his trial for him to testify as

22  to those matters and be subject to cross-examination to create

23  the foundation or the basis for bringing Mr. Massino in here.

24          MR. LEVIN:  Your Honor, that is a good point.  I'm

25  prepared to discuss that point.

252

1          THE COURT:  I'm not prepared -- you're having oral

2     argument.  If you want to put him on the witness stand, you

3     can do so.  I'm not telling you what to do.

4          MR. LEVIN:  Prior to me putting Mr. Basciano on the

5     witness stand, I would ask for a ruling from your Honor on

6     what the government can and cannot ask and also ask for a

7     ruling that testimony would not be specifically allowed to be

8     used at the trial of either this case or the 05 indictment,

9     which I think your Honor is saying that.

10          I would not want that to come in on the government's

11     direct case.  If Mr. Basciano were to choose to testify and

12     they wanted to use it to impeach him, that is a different

13     issue, but I would ask for a ruling that it cannot come in on

14     their direct case.

15          I'd ask that their examination of Mr. Basciano be

16     limited to what was brought out on direct and nothing further,

17     similar to what the government did to me when I tried to get

18     into areas beyond the direct.

19          MR. ANDRES:  Judge, this is hardly the time to raise

20     this issue when Mr. Levin has had weeks if not months to brief

21     it.  This entire proceeding has been a ruse because they never

22     intended to call Mr. Basciano.

23          Mr. Levin has said that from day one.  They

24     submitted an affidavit which I'm assuming was the basis -- it

25     was the only basis for your Honor to grant a hearing in this

1   matter.  Now they want a ruling before the witness even

2   testifies about what the implications are of the testimony and

3   what areas we can go to.  That is not what the hearings and

4   trials are all about.

5          We have to hear what he says first.  Once we hear

6   what he says first, Mr. Levin, maybe even Mr. Savitt, can

7   brief all of these issues, but they can't ask the government

8   for -- I mean ask the court for an advisory opinion before

9   that even happens.

10         Moreover, Judge, what is the difference, it does not

11  matter -- given what the testimony has been, it does not

12  matter what Mr. Massino said and it does not matter what.

13  Mr. Basciano said because the issue here is where has the

14  government manipulated the situation to provide an event in

15  which Mr. Massino and Mr. Basciano could be together.

16         The defense has the burden to show that.  We have

17  taken it on our shoulders and proved that that is not possible

18  because the two times when they spoke, November 23rd, was a

19  court hearing that your Honor ordered for the indictment.

20  Moreover, that was 11 days after Mr. Massino was specifically

21  told he wasn't cooperating because he was facing the death

22  penalty.

23         You have the testimony of Mr. McDonald that says the

24  deal was dead, there was no cooperation.  At no time after

25  November 23rd until, hypothetically, January when he wears a

254

1   wire, giving the defense the benefit of the doubt that he's a

2   cooperator, he's not working for the government.

3          Mr. Levin asked what are the instructions that the

4   government gave to Mr. Massino for the court appearance?  Mr.

5   McDonald said, Instructions?  There were no instructions.  He

6   wasn't working for the government.  That was clear.

7          As of December 3rd, who arranged that meeting?  The

8   defense lawyers.  So now the government -- this is so absurd.

9   Now the government -- the question is that the government is

10  manipulating Mr. Basciano when he voluntarily goes to a

11  co-defendant meeting with his co-defendants --

12         THE COURT:  I think Mr. Basciano wants to talk to

13  you.

14         MR. ANDRES:  I'm not sure that my argument should be

15  stopped because Mr. Basciano wants to consult with his

16  lawyers.  If I can finish?

17         DEFENDANT BASCIANO:  I apologize.

18         MR. LEVIN:  Let him finish.

19         THE COURT:  I'm sorry.  It was my fault.

20         DEFENDANT BASCIONE:  My fault.

21         THE COURT:  Please be seated.  Go ahead.

22         MR. ANDRES:  Judge, the defense lawyers called a

23  meeting in which Mr. Basciano voluntarily went, and by the

24  way, in which he discussed criminal activities at that time,

25  and benefitted from it.

255

```
1          That is the government manipulating Mr. Massino to
2   put him in a position when Mr. Basciano willingly goes to a
3   co-defendant meeting?  There is nothing here.  There is
4   absolutely no evidence of any manipulation on the part of the
5   government so Mr. Basciano doesn't need to testify, and
6   Mr. Massino doesn't testify.
7          Your Honor doesn't need to hearing anything else
8   because the defense has no evidence and you should rule today
9   that this issue is now resolved because, frankly, it's been a
10  ruse from day one.
11         MR. LEVIN:  All of the cases, the cases cited by
12  your Honor, the cases cited by the government, the cases cited
13  by myself all talk about one creating the opportunity; two,
14  the informant questioning the defendant.
15         This is not a situation where you have a passive
16  listener, like in Bushel, where there is a passive listener.
17  This quiet man, who is a drug mule who is sitting in a cell
18  with some other co-defendant and he's learning about the guy's
19  criminal activities.
20         THE COURT:  How did the government create the
21  opportunity here?
22         MR. LEVIN:  They created the opportunity, whatever
23  their motives, by allowing themselves, after they start
24  proffering Massino, to allow Massino to be in the presence of
25  Mr. Basciano, knowing full well that Mr. Massino was his boss
```

1   and that Mr. Basciano would be compelled to respond to

2   Mr. Massino's questions.

3           It is obvious when one listens to the tapes of

4   January 3rd that Mr. Massino has a commanding presence.  One

5   of the questions that I wanted to ask Mr. McDonald was what

6   type of personality does your client have?  He has a

7   commanding presence.  He requires people to respond to him.

8   My client on those tapes is very-

9           THE COURT:  I've heard the tapes.

10          MR. LEVIN:  He's submissive.  The point being is --

11          MR. ANDRES:  I assume for the purposes of this

12  argument that Mr. Levin is stipulating that Mr. Basciano is

13  also a captain in the Bonanno family and subject to the

14  authority of Mr. Massino?

15          MR. LEVIN:  No.  But as usual, Mr. Andres likes to

16  fill in the gaps for me.

17          THE COURT:  He doesn't have to go far to fill that

18  that gap based on what was just said.

19          MR. LEVIN:  It's on the tapes.

20          THE COURT:  You're characterizing what is on the

21  tape in that Mr. Massino is the boss and Mr. Basciano was the

22  vassal, pardon the expression.

23          MR. ANDRES:  For the purposes of the Bonanno family.

24          MR. LEVIN:  The word vassal is much more appropriate

25  than captain.  No one is going to be disputing at this trial

257

1   that Mr. Basciano knew Mr. Massino, that is not going to be a

2   defense at this trial.

3         THE COURT:  Their respective status is what you

4   commented on and Mr. Andres picked it up and --

5         MR. LEVIN:  I commented on --

6         THE COURT:  My radar picked it up as well.

7         MR. LEVIN:  Mr. Massino was the boss of the Bonanno

8   crime family.  Mr. Massino would go into these co-defendant

9   meetings, he would sit at the head table and he would question

10  people and ask questions and people responded.

11        MR. ANDRES:  That is based on what evidence?  That

12  is based on Mr. Levin's personal attendance at those meetings,

13  in which I'm assuming he had a joint defense privilege among

14  all the people, because you remember that Mr. Levin had

15  previously represented Mr. Lino, who is also a captain in the

16  Bonanno family.

17        If Mr. Levin is trying to proffer information from

18  another co-defendant meeting in which he represented another

19  defendant, that is troubling.

20        THE COURT:  You can't both talk at once.

21        MR. ANDRES:  Very troubling.

22        MR. LEVIN:  What I'm trying to do is make an offer

23  of proof of why we need Mr. Massino on the stand.  I am not

24  divulging a statement from a co-defendant meeting in an

25  unrelated case.

258

1          Mr. Andres does a very good job through his forceful

2     personality, and I don't have his energy anymore to just push

3     and push.

4          THE COURT:  Please.

5          MR. LEVIN:  He is mixing apples and oranges.  I am

6     talking about this case, this indictment and this time.  The

7     point being, Judge, is the only way this court is going to

8     know whether Mr. Massino, one, followed the instructions of

9     the government and, two, whether, notwithstanding the

10    instructions of the government, he gave them information he

11    shouldn't have and then the government accepted that

12    information and benefited from it, is if you put Mr. Massino

13    on the stand.  There is no other way your Honor can make a

14    decision --

15         THE COURT:  Well, if the government seeks to

16    question Mr. Massino in some area that may have been touched

17    upon in those conversations which involves the charged

18    conduct, before he testifies I can have him questioned without

19    the jury present as to those particular areas, assuming that

20    he testifies in this case at all, which is an assumption.

21         MR. LEVIN:  Then what was the purpose of the Messiah

22    hearing?  I thought we were trying to clarify that now.  I

23    know this is an alternative.

24         THE COURT:  What you're positing is a narrow, very

25    narrow set of discussion that, you know, doesn't go to the

1    grand scheme that you claim Mr. Massino had along with the

2    government to put Massino with Basciano in order to tread on

3    forbidden ground.

4         Based on the testimony that we have had thus far, it

5    would appear that the circumstances did not exist which would

6    trigger a Messiah violation.  So that is where I am on this at

7    least until I give you my formal decision, but that is really

8    where we are.

9         The fact that Mr. Basciano provided an affidavit

10   really doesn't bear upon the circumstances, which are very

11   limited on two different occasions, both of which occurred

12   after Mr. Massino's cooperation was terminated by virtue of

13   the certification of the death penalty by the Attorney General

14   on November 12th.  So that is where I am.

15        Now that I have the chronology, and I'm familiar

16   with that, it places the issue in a much more focused light.

17   That's what I'm saying to you.

18        MR. LEVIN:  I agree with the court.  To the extent

19   that I'm asking for the hearing, we can limit the hearing of

20   Mr. Massino to those two dates, those conversations and the

21   302s that were a result of November 23rd and November 2nd.

22        MR. ANDRES:  There has been no proof that the

23   government put those people together.  Mr. Levin can say that,

24   but it's absurd.

25        MR. LEVIN:  My client is requesting consultation on

260

1  whether he should or should not testify.  Can we have ten

2  minutes?  I'd like to speak to my client.

3         MR. ANDRES:  This is not the time for this.  It is

4  irrelevant whether Mr. Basciano testifies.  Absent an offer of

5  proof, his testimony is not relevant.  So if there's going to

6  be a question of whether or not he testifies, I want an offer

7  of proof as to what specifically he's going to testify.

8         Mr. Levin should also be on notice, certainly, that

9  given that he's acknowledged Mr. Basciano's position in the

10 Bonanno family there are ethical considerations in terms of

11 what his defense could be at trial.

12        MR. LEVIN:  If I may?  Mr. Andres needs the ten

13 minutes to go get his paperwork for the next witness anyway.

14 I can consult with my client --

15        THE COURT:  You all consult and I'll do my own

16 consulting and then we'll come back and consult with each

17 other.

18        MR. LEVIN:  Fifteen minutes, your Honor, ten

19 minutes?

20        MR. ANDRES:  Judge, what --

21        THE COURT:  What is this book?

22        MR. ANDRES:  This is the trial book.

23        MR. LEVIN:  It's blank, Judge.

24        MR. ANDRES:  Judge, since I'm in charge of copying

25 the questionnaires, I want to be clear about the number of

1  questionnaires that are going to everybody.  Mr. Basciano is

2  getting two.  Mr. DeFilippo is getting --

3        THE COURT:  Three I thought?

4        MR. LEVIN:  Three, yes.

5        MR. ANDRES:  He was getting three at a time when we

6  were not going to put him at the MDC.  Now they are going to

7  the MDC, so I'll give one to each lawyer, which is normally

8  one more than we give.

9        We were proposing that they get two and Mr. Basciano

10 get the third.  Now they are in same the jail; that's the

11 three, one in the jail, two for the lawyers.  One for

12 Mr. DeFilippo, two for the court, one for the MDC, one for the

13 MCC and one for the government.

14       THE COURT:  That's fine.  As long as we are still

15 discussing questionnaires.  We had a request from the press

16 for a blank copy of the questionnaire and I wanted to raise

17 that with you all because I thought it appropriate to hear

18 from you about it before I make any determination.

19       MR. LEVIN:  We have no objection.

20       MR. ANDRES:  I don't think we have any objection,

21 Judge.

22       THE COURT:  All right.  That having been said, I

23 will make a copy of the blank questionnaire available to the

24 press.  In fact, I will just make it available today.

25       MR. LEVIN:  May we speak with our client here?

262

1          THE COURT:  Is it all right with the marshal?  Do

2    you have any problem?

3          THE MARSHAL:  No.

4          THE COURT:  All right.  Thank you very much

5    everyone.  We will take ten minutes.

6          (Recess.)

7          THE COURT:  Back on the record.  Let's talk about

8    this.

9          MR. LEVIN:  Your Honor, I'm not going to put

10   Mr. Basciano on.  We will rest at this point.

11         THE COURT:  All right.  Anything else?

12         MR. ANDRES:  Obviously, as we have noted before, we

13   just need a little bit of time to advise the marshals if and

14   when they have to produce Mr. Massino.

15         THE COURT:  What?

16         MR. ANDRES:  If and when the court decides -- I

17   assume you're not going to decide it, but if you decide that

18   Mr. Massino has to be produced, we have to allot a certain

19   amount of time for the marshal to produce him.  I'm advising

20   the court.

21         THE COURT:  Do you have any other argument at this

22   point?

23         MR. ANDRES:  No, Judge.

24         MR. LEVIN:  A point for your Honor's consideration

25   that was brought up in my conferences, the fact that

1  Mr. Basciano, for the same reasons Massino was concerned about

2  security while he attended the co-defendant meetings,

3  Mr. Basciano also felt that if he refused to attend the

4  co-defendant meetings he would be looked upon adversely by

5  Mr. Massino and others at that time, so he was compelled to

6  attend those codefendant meetings.

7          It isn't as simple as Mr. Andres said, that

8  Mr. Basciano chose to attend.  He had to attend.

9          MR. SAVITT:  If I may, your Honor, I know I haven't

10  said very much --

11          MR. ANDRES:  Why is Mr. Savitt even speaking?  He's

12  not a lawyer in this case.  He hasn't filed a notice of

13  appearance in this case.  I do not understand that.

14          THE COURT:  Yes, but Mr. Savitt, to the extent that

15  he can illuminate the discussion, it's appreciated, he's the

16  -- he's death counsel in the second case and that affords him

17  special status since the court appointed him to that position,

18  and I will hear from him.  Then I can discount every word he

19  said if I don't think that it's valuable.

20          MR. ANDRES:  Is he going to be sitting at the table

21  at trial?

22          THE COURT:  Do I have to decide that now?

23          MR. ANDRES:  I just, frankly, don't understand why

24  Mr. Savitt shows up here every time.  He certainly doesn't

25  have standing to --

264

1          MR. LEVIN:  It's very disrespectful.

2          THE COURT:  I don't want to discuss Mr. Savitt.  I

3     want to hear from him.

4          MR. LEVIN:  Fine.  Go ahead.

5          MR. SAVITT:  I could have been done a long time ago.

6     It was just a minor point, but it has --

7          THE COURT:  It better be good now.

8          MR. SAVITT:  Mr. Andres says that the co-defendant

9     meeting is something that the defendants chose to schedule and

10    to attend.  The fact of the matter is, as Mr. Andres' own

11    evidence shows, it was Flora Edwards who put in for the

12    co-defendant meeting, at the behest of Mr. Massino, who

13    summoned everybody to be at that meeting.

14         MR. ANDRES:  Where is the evidence of that?

15         MR. SAVITT:  Frankly, that is an artifice, with all

16    due respect to Mr. Andres.

17         MR. ANDRES:  We're all supposed to assume that

18    Mr. Basciano is compelled to go to co-defendant meetings?

19    That's absurd.

20         MR. SAVITT:  That is why we need Mr. Massino to

21    testify.

22         MR. ANDRES:  Where is the evidence that Flora

23    Edwards compelled that meeting?  Why is Flora Edwards not here

24    to testify about that fact?  Why hasn't there been an

25    affirmation or affidavit filed by Miss Edwards that she called

265

1    that meeting?  These are arguments are frivolous.

2          MR. LEVIN:  Miss Edwards has been interviewed.  She

3    refuses to talk about anything that took place with

4    Mr. Massino.  I have spoken to her personally on several

5    occasions and she says she is most uncomfortable talking about

6    it because she didn't even understand there were shadow

7    counsel, because that's the purpose of shadow counsel, and she

8    felt that she had been used by Mr. Massino throughout the

9    whole process.  For what it's worth, that is what she would

10   say.

11         MR. ANDRES:  We're in a legal proceeding using legal

12   processes to bring relevant here evidence here.  If Mr. Levin

13   or Mr. Savitt wanted to subpoena Flora Edwards, they had the

14   ability to do that.  She clearly can't have a privilege as to

15   whether or not she was responsible for calling that meeting.

16         MR. SAVITT:  She put in the paperwork for the

17   meeting.  It's the government's own exhibit.  I don't

18   understand the argument.

19         MR. ANDRES:  Where?

20         MR. SAVITT:  It's your exhibit.

21         MR. ANDRES:  Where?

22         MR. LEVIN:  Get your exhibit.

23         MR. ANDRES:  If you're referring to an exhibit --

24         THE COURT:  You're all talking at once.

25         MR. ANDRES:  I assume if you're referring to an

266

1    exhibit you have read it and have it in which Miss Edwards

2    requests the December 3rd meeting.

3              MR. LEVIN:  It's in your exhibit book.

4              MR. ANDRES:  Show it to me.

5              MR. LEVIN:  Miss Edwards wrote a letter requesting

6    the meeting for December 3rd. It's in the book.

7              (Pause.)

8              MR. ANDRES:  And it's not in here.  I brought the

9    evidence that I was planning on relying on.  It's not in here.

10             MR. LEVIN:  You took it out.  It was in the court's

11   book yesterday.  There was a letter entered into evidence by

12   Miss Edwards, authored by Miss Edwards.

13             MR. ANDRES:  It does not request the December 3rd

14   meeting.

15             MR. LEVIN:  Yes, it does.

16             THE COURT:  December 17th at 10:30 a.m., Government

17   Exhibit Q.  That's what it says.

18             MR. ANDRES:  Exactly.  There is no letter and

19   nothing in evidence in which Miss Edwards requests the

20   December 3rd meeting, period.

21             MR. LEVIN:  I don't have it in front of me, but I

22   believe what I saw yesterday is the letter requested that the

23   meeting take place.

24             MR. ANDRES:  The judge said no.

25             THE COURT:  There's also a memorandum to the front

1  lobby officer from Justin Lillien at the Bureau of Prisons,

2  which lists those individuals who are authorized to attend the

3  December 3rd meeting.

4         It doesn't appear to indicate who requested it, it

5  just says it's happening and these are the people who are

6  going.

7         MR. ANDRES:  Moreover, Judge, if Mr. Basciano was

8  there pursuant to the procedures that this court has also set

9  forward, that means one of his lawyers was also there and I'm

10 assuming that his lawyers are not operating under the

11 direction of the Bonanno family but that they went willingly

12 as well.

13         THE COURT:  Well --

14         MR. LEVIN:  That is not an issue.

15         THE COURT:  Just for the sake of completeness, the

16 lawyer listed for Mr. Basciano is Benjamin Brafman.

17         MR. ANDRES:  Mr. Basciano has just said that Tommy

18 Lee was there as his lawyer.  And I'm certainly not

19 encouraging Mr. Basciano to speak, but he's having a hard time

20 not speaking --

21         THE COURT:  I'm not asking him to speak.

22         MR. ANDRES:  He just said in open court that --

23         THE COURT:  You're interrupting me now.  On this

24 list Mr. Lee is listed as representing Mr. Donato.

25         MR. ANDRES:  Correct.  So --

268

1          THE COURT:  So anyway.  Go ahead.  I'm not going to

2     try to reconstruct this.  All that is in evidence is a hearsay

3     document as to who was authorized to attend, not who attended,

4     and not who they actually represented, but who they were

5     supposedly representing, according to this person at the

6     Bureau of Prisons.

7          So unless we want to completely reconstruct

8     everything that happened, which you all have decided not to do

9     because you've all rested, I think I should just move on.

10          MR. ANDRES:  That's my point exactly.  My point is

11     that the defense hasn't proven that the meeting was called by

12     Miss Edwards.

13          MR. LEVIN:  If that issue, your Honor, would be a

14     material issue in your Honor's decision on whether to call

15     Mr. Massino, under those circumstances I would request an

16     opportunity to call Miss Edwards.  If your Honor does not

17     think that that is a material issue in his decision making

18     process then I rest.

19          MR. ANDRES:  I would add that Miss Edwards does not

20     work for the government.  So even if she called the meeting,

21     it doesn't suggest any government coercion or government

22     setting up the opportunity for them to meet.

23          THE COURT:  How does that indicate the government's

24     participation -- even if Mr. Massino said to Miss Edwards, I'd

25     like to have a joint defense meeting, how does that

 1   demonstrate Massino was acting as an agent of the government

 2   or that the actions of the government put the inmates together

 3   in prison for the purpose of discussing the charged conduct,

 4   how does that do that, especially taking into account the

 5   unrefuted evidence that the government advised Mr. Massino

 6   that upon his certification for the death penalty by the

 7   Attorney General that the cooperation discussions were over?

 8   Do we have any answer to that?

 9          MR. SAVITT:  No, we don't.  There is a gap, if I

10   may, your Honor.  Mr. Massino said that he was appointed by

11   the court as shadow counsel.  Obviously, everything

12   Mr. McDonald says I don't have any issue with.  The only thing

13   that I'm at a failure to understand is that if the government

14   told Joseph Massino that his cooperation was at an end, and it

15   was over, why is Mr. McDonald still operating as a shadow

16   counsel?  If it's over it's over.

17          Apparently there was obviously some glimmer, some

18   spark in there where the government held out some hope for

19   Mr. Massino, and it was well-founded obviously, that the

20   cooperation deal can be rekindled at a future date, and in

21   fact it was.

22          THE COURT:  That is your theory.

23          MR. SAVITT:  Well, it's a theory.

24          THE COURT:  It's a theory.  But the fact is, as a

25   practical matter, Mr. Breitbart at that point was no longer

1   Mr. Massino's counsel because Mr. Massino had taken the step

2   to attempt to cooperate at the end of the trial on July 31st,

3   as is clear from the record, and this was done in such a way

4   that Mr. Breitbart was not aware, nor was Miss Edwards, and

5   all that was left for Mr. Massino to discuss with the

6   government, according to the unrefuted testimony of the

7   government officials who testified here, was whether

8   Mr. Massino would want to plead guilty to the Sciascia murder

9   if the death penalty were taken off the table and Mr. Massino

10  did not appeal from the verdict of this jury in the prior

11  trial.

12         So that was still on the table.  Whether the court

13  should have removed Mr. McDonald and found some other counsel

14  for him -- remember, the jury had already ordered Mr. Massino

15  to forfeit $10 million so he wasn't in a financial position --

16  it would appear he was not in a financial position to pay for

17  his own defense at that point so he'd end up with CJA counsel

18  one way or the other.  Mr. McDonald was familiar with the

19  case.

20         Mr. McDonald did not come to me and say, you know,

21  the cooperation is over and I want to be relieved.  He felt he

22  had a professional obligation, I assume, to see Mr. Massino

23  through with any discussions that he would have with the

24  government over the only remaining issue, which was pleading

25  guilty to the murder of Mr. Sciascia.  That is the way I see

271

1    it.

2              MR. ANDRES:  That's what the testimony was, Judge.

3              THE COURT:  Based on the testimony and based upon

4    the prior proceedings in these matters, with which I'm

5    familiar.

6              MR. ANDRES:  Judge, to clarify the record,

7    Mr. McDonald I think was retained.  Although he was appointed

8    shadow counsel, I don't think he was appointed pursuant to the

9    Criminal Justice Act.  I think he was retained for a nominal

10   sum and continued to represented Mr. Massino during that time.

11   I don't think he ever submitted any CJA vouchers.

12             THE COURT:  He may not have submitted any vouchers,

13   I'd have to go look.

14             MR. ANDRES:  It's not relevant.

15             THE COURT:  If he submitted the vouchers, he would

16   have gotten paid.  He can work for nothing for all I care and

17   help the government with its deficit.

18             Yes.  Anything else?

19             MR. SAVITT:  We'll rest, Judge.

20             MR. LEVIN:  My witness for the Wade hearing?

21             THE COURT:  Have a seat for a moment.

22             MR. LEVIN:  Sure.

23             (Pause.)

24             THE COURT:  I'm going to issue a ruling on this

25   right now.

1          As I ruled in my memorandum and order on January 3,

2    2006, Mr. Basciano met the burden to be afforded a Messiah

3    hearing on the issue of whether Mr. Massino's testimony at

4    trial about two unrecorded conversations between Massino and

5    Basciano would violate Mr. Basciano's Sixth Amendment right to

6    counsel.

7          At that time I had before me the evidence that

8    Joseph Massino had worn a government wire, recorded a

9    conversation with Basciano a month after the conversations at

10   issue.  This was sufficient to raise a suggestion that Massino

11   may have been a government agent at the time of the unrecorded

12   conversations.

13          I also had Mr. Basciano's affidavit that Mr. Massino

14   had asked him questions and not merely listened during those

15   conversations which were not recorded.  There was a suggestion

16   that Basciano and Massino would not have been placed together

17   but for the interference of the government.

18          Yesterday and today, the court heard the

19   government's presentation of its position that it had not made

20   any efforts to place Massino and Basciano together; that

21   Massino was not acting as a government agent at the time of

22   the conversations, and that Massino had been instructed not to

23   ask questions.

24          The government presented the testimony of FBI

25   Special Agent Kimberly McCaffrey, of Massino's shadow counsel,

1   Edward McDonald, of staff attorney of the Metropolitan

2   Detention Center, Rina Desai, and Deputy U.S. Marshal John

3   Drago.

4           These witnesses, along with a number of Government

5   EXHIBITS, established neutral reasons for the two times that

6   Massino and Basciano were able to talk with one another.  They

7   also establish that before the conversations in question,

8   Massino had been told, on or about November 12, 2004, that

9   there was no chance of a cooperation agreement.  The only

10  subject still open to negotiation was whether he was willing

11  to plead guilty to the charge of murdering George Sciascia in

12  his death penalty case in which the Attorney General had

13  previously certified the prosecution for a possible sentence

14  of death.

15          Yesterday the government sufficiently established

16  that Joseph Massino fit more into the model of an

17  entrepreneurial inmate whose questions do not violate Messiah,

18  as explained by the Second Circuit in United States v. Birbal,

19  113 F.3d, 342 at 346.

20          I have been very clear from the beginning that

21  affidavits were not sufficient for this hearing and that I

22  wanted live testimony.  The government thus has been on notice

23  that it may need to present Joseph Massino at the hearing to

24  testify.  Nonetheless, within the Birbal analysis, it is not

25  important what the entrepreneurial inmate said to the

274

1    defendant to get a confession.  Massino's testimony therefore

2    was not vital to the court.

3            Basciano did not offer compelling evidence to

4    dispute the government's case.  In fact, Basciano did not

5    offer any witnesses.  Once the government had met its burden,

6    Basciano needed to demonstrate specifically how the government

7    was involved in the conversations, either by showing evidence

8    that Massino was an agent of the government or by showing

9    actions by the government to put two talkative inmates

10   together.  Basciano, instead, sought to show that the

11   government did not do enough to prevent Massino from asking

12   Basciano about crimes for which Basciano was already indicted

13   and that Massino did in fact ask probing questions about

14   subjects relating to Basciano's existing indictment.

15           This alone is not sufficient to establish a

16   violation of Basciano's Sixth Amendment right to counsel under

17   Messiah v. United States.  Because the government has shown a

18   lack of government agency in the conversations in question,

19   and because Mr. Basciano has failed to prove any government

20   agency, the court will admit Mr. Massino's testimony about the

21   conversations at trial, if such testimony is offered by the

22   government.

23           All right.  You may call your witness in the Wade

24   hearing.

25           MR. LEVIN:  Margaret Clemons.

Clemons  - direct/Levin                    275

1   M A R G A R E T   C L E M O N S ,

2        called as a witness, having been first duly sworn,

3        was examined and testified as follows:

4   DIRECT EXAMINATION

5   BY MR. LEVIN:

6   Q    Good afternoon, Miss Clemons.

7   A    Good afternoon.

8   Q    Miss Clemons, how you are employed?

9   A    I am a private investigator in the State of New York.

10  Q    How long have you been a private investigator?

11  A    About 25 years.

12  Q    And as a private investigator do you engage in work for

13  criminal defense attorneys?

14  A    Yes, I do.

15  Q    Have you worked with me in the past?

16  A    Yes, I have.

17  Q    How many years have we been working together,

18  approximately, on and off?

19  A    Fifteen.

20  Q    Did there come a time that I have reached out to you to

21  work for me in regard to Mr. Basciano?

22  A    Yes.

23  Q    Were you given an assignment in regard to Mr. Basciano?

24  A    Yes, I was.

25  Q    Were you given an assignment in regard to interviewing

Clemons  - direct/Levin                          276

1  one David Nunez?

2  A    Yes.

3  Q    And what, if anything, did you do as a result of me

4  giving you that assignment to interview Mr. Nunez?

5  A    I located Mr. Nunez.

6  Q    Where did you find him?

7  A    He was incarcerated at Cayuga Correctional Facility,

8  Upstate.

9  Q    And what did you do in order to interview him at Cayuga

10 Correctional Facility?

11 A    Arrangements were made through the institution.  I went,

12 I interviewed him.

13 Q    Did he agree to see you, Mr. Nunez agree to see you at

14 the institution?

15 A    Yes, he did.

16 Q    Did you go alone or did you go with someone else?

17 A    I went with Stan Kochman.

18 Q    Do you know what Stan Kochman does for a living?

19 A    He's also a private investigator.

20 Q    Do you recall the date that you interviewed Mr. Nunez?

21 A    I believe it was May 18th of 2005.

22 Q    When you met Mr. Nunez on May 18, 2005, that was with

23 Mr. Kochman, correct?

24 A    Yes, that's correct.

25 Q    Was he pleasant and willing to speak to you at the

Clemons  - direct/Levin                    277

1    interview?

2    A    Yes.

3    Q    Did you tell him that you were working for Mr. Basciano?

4    A    Yes. And Anthony Donato.

5    Q    Anthony Donato?

6    A    Yes.

7    Q    As a result of that interview, did you come to learn what

8    happened to Mr. Nunez on November 14, 1985?

9    A    Yes.

10   Q    What did Mr. Nunez say happened to him on November 14,

11   1985?

12   A    He said that he was shot.

13   Q    As a result of him being shot, what happened next, did he

14   tell you that?

15   A    Yes.  He said that after he was shot he went to the

16   hospital and while he was in the hospital being treated for

17   his gunshot wounds, he was visited by -- by police, maybe from

18   the DA's office, or Organized Crime Unit.

19   Q    Did he tell you the name of the ADA that he met with from

20   the Bronx?

21   A    Yes, he did.

22   Q    Do you recall the name?

23   A    Calmus --

24   Q    Would the name Calmus ring a bell?

25   A    That's correct.

Clemons  - direct/Levin                    278

1    Q    Did Mr. Nunez discuss with you that there came a time

2    that he was interviewed by some detectives from the Bronx

3    District Attorney's office?

4    A    Yes.

5    Q    Will you tell us the circumstances of that interview?

6    A    Yes.  He had, after he was released from the hospital,

7    which was the same day of the shooting, at his home he was

8    visited by a detective who further interviewed him and, in

9    addition, he was shown photographs.

10   Q    During the course of the interview, what type of

11   photographs did they show Mr. Nunez, if you know?

12   A    Mr. Nunez said that the photographs he was shown appeared

13   to be surveillance photographs, not mug shots.

14   Q    And what else did Mr. -- what, if anything, did Mr. Nunez

15   say about the surveillance photographs?

16   A    He said that the surveillance photographs were signed.

17   Q    Signed by whom?

18   A    There were names on each surveillance photograph,

19   including the name of Vincent Basciano.

20   Q    Did he tell you if those surveillance photographs showed

21   Mr. Basciano individually or with other people?

22   A    I believe they were individual.

23   Q    And Mr. Basciano's name appeared at the bottom of the

24   photograph?

25   A    That's correct.

Clemons  - cross/Andres                    279

Q    As a result of seeing those photographs, what else
happened, what else did you learn happened to Mr. Nunez after
he viewed the photographs?

A    After the photographs, there was -- there were two
lineups and --

Q    As a result of those lineups -- withdrawn.

        Did Mr. Nunez ever discuss with you his ability to
point out Mr. Basciano at the lineup?

A    Yes, he did.

Q    What did he tell you?

A    He said that thanks to the photograph of Mr. Basciano
that he had seen with Basciano's name written on the
photograph, he was able to identify him in the second lineup.

        MR. LEVIN:  Nothing further, your Honor.

        THE COURT:  Cross-examination.

        MR. ANDRES:  Thank you.

CROSS-EXAMINATION

BY MR. ANDRES:

Q    Good afternoon, Miss Clemons.

A    Good afternoon.

Q    We have not met before, have we?

A    No.

Q    Is it true that you denied a request by the government to
interview you prior to this hearing?

        MR. LEVIN:  Objection.

BHS      OCR      CM      CRR      CSR

1          THE COURT:  Overruled.

2    A    I was not asked to be interviewed by the government about

3    this.

4    Q    Mr. Levin never asked you if -- never communicated to you

5    that the government wanted to interview you?

6    A    No.  He said that if I was asked to be interviewed that I

7    should refer any questions to him since I was retained by him.

8    Q    My question is different.  Did at any point today?

9    Mr. Levin ask you or communicate to you that the government

10   had made a request today to interview you prior to this

11   hearing, yes or no?

12   A    No.

13   Q    You said earlier, you just testified when Mr. Levin was

14   asking you questions that Mr. Nunez said in sum and substance

15   that prior to his seeing the lineup he saw a photograph of

16   Vincent Basciano; is that right?

17   A    Yes.

18   Q    It was a surveillance photograph?

19   A    He said so, yes.

20   Q    And he said that helped him identify Mr. Basciano in the

21   other photograph; is that right, in the lineup?

22   A    In the lineup.

23   Q    So just so we're clear, having seen the surveillance

24   photograph, that helped him identify Mr. Basciano in these

25   lineups?

Clemons  - cross/Andres                    281

1    A    Yes.

2    Q    That would presuppose, wouldn't it, that Mr. Nunez had a

3    prior relationship with Mr. Basciano?

4              MR. LEVIN:  Objection to the form of the question.

5              THE COURT:  Sustained.

6    Q    Do you know if Mr. Nunez had a prior relationship with

7    Mr. Basciano?

8              MR. LEVIN:  Objection.  Beyond the scope of direct.

9              THE COURT:  Overruled.  You may answer.

10   A    A prior relationship?

11   Q    Yes.

12   A    I don't know.

13   Q    Well, if Mr. Nunez said to you that that photo helped him

14   recognize Mr. Basciano, doesn't that mean to you that he knew

15   Mr. Basciano?

16             MR. LEVIN:  Objection as to what it means to this

17   witness.  Her state of mind is irrelevant.

18             THE COURT:  Sustained.

19             MR. ANDRES:  This entire line of --

20             THE COURT:  Excuse me.  Ask your next question.

21   Q    What did you understand that to mean?

22             MR. LEVIN:  Objection as to what Miss Clemons' state

23   of mind is.

24             MR. ANDRES:  This is all based on Miss Clemons'

25   testimony.

Clemons  - cross/Andres                    282

1          THE COURT:  I'm going to overrule the objection.

2   You may answer.

3   A    What I understood was that thanks to the photograph with

4   Vincent Basciano's name on it in the lineup he picked out

5   Vincent Basciano based on that photograph.

6   Q    Did he say the name Vincent Basciano?

7   A    At the lineup?

8   Q    When he was shown the photograph, did he know -- did you

9   ask him whether or not he knew Mr. Basciano?

10  A    The photograph was -- the name Vincent Basciano was on

11  the photograph.

12  Q    I'm asking a different question.  During the course of

13  your interview, did you ever ask Mr. Nunez if he knew Vincent

14  Basciano?

15         THE COURT:  Is this prior to seeing the photograph?

16  Q    At the time of the interview in 2005, after he saw the

17  photograph.

18         THE COURT:  I'm sorry.  When he saw the photograph

19  in 1985?

20         MR. ANDRES:  I'm asking a question about Miss

21  Clemons' interview of Mr. Basciano in 19 -- 2005.

22         MR. LEVIN:  Mr. Nunez.

23         MR. ANDRES:  I'm sorry, the interview of Mr. Nunez

24  in 2005.

25         THE COURT:  Have we established that the witness

Clemons  - cross/Andres                                 283

1   showed Mr. Nunez a photograph?

2   Q    Did you show Mr. Nunez any photographs?

3   A    No.  I did not.

4   Q    Did you ask Mr. Nunez whether or not he knew

5   Mr. Basciano?

6   A    I did not.

7   Q    Did you ask him if he knew Mr. Nunez?

8             MR. LEVIN:  Sorry?

9   Q    Did you ask Mr. Nunez -- I'm sorry.  Have you ever asked

10  Mr. Basciano if he knew Mr. Nunez?

11            MR. LEVIN:  Objection.

12            THE COURT:  Sustained.

13  Q    Prior to the time that you interviewed Mr. Nunez, did you

14  do any investigation with respect to the attempted murder of

15  David Nunez?

16            MR. LEVIN:  Objection.  Beyond the scope of the

17  hearing.  This is a Wade hearing.

18            MR. ANDRES:  She went to the prison to interview the

19  man about a crime.

20            THE COURT:  You may answer.

21            MR. LEVIN:  If I may?  She went to the prison to

22  interview Mr. Nunez concerning his ability to identify

23  Mr. Basciano, and the circumstances of that interview are not

24  relevant.  The only information --

25            MR. ANDRES:  Time out.  He can't tell Miss

Clemons  - cross/Andres                    284

1   Clemons -- he's trying to tell Miss Clemons --

2           THE COURT:  You want her to excuse herself so we can

3   have a debate?

4           MR. ANDRES:  I want to ask a question.

5           THE COURT:  Mr. Levin wants to make a point.

6           MR. ANDRES:  Can we go sidebar?

7           THE COURT:  Sidebar.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Clemons  - cross/Andres                285

1        (Sidebar.)

2        THE COURT:  All right.

3        MR. LEVIN:  Your Honor, this is a Wade hearing.  The

4   sole purpose of this hearing is to determine whether there was

5   suggestibility in any of the procedures that were used with

6   Mr. Nunez in order for him to identify Mr. Basciano.

7        Miss Clemons was sent to the prison to interview

8   Mr. Nunez concerning the circumstances of the identification

9   proceeding and what took place as a result of that.  The

10  interview consists of did he know him.  The answer is no.

11       MR. ANDRES:  Judge --

12       THE COURT:  Let him finish then you get to talk.

13       MR. LEVIN:  What happened, he was shot.  As a result

14  of being shot what happened next?  He learned that he came to

15  that evening --

16       THE COURT:  She hasn't testified to that.

17       MR. LEVIN:  She has testified in depth.  The police

18  came to his home and showed him a series of photographs.

19       MR. ANDRES:  She didn't say at his home.

20       MR. LEVIN:  I think she said that.

21       THE COURT:  The home thing I don't remember.

22       MR. LEVIN:  I think she said it was after he was

23  discharged from the hospital, that is my recollection.  Point

24  being is that he was shown these individual surveillance

25  photographs with Mr. Basciano's name on it.  As a result of

BHS     OCR     CM     CRR     CSR

Clemons  - cross/Andres                    286

1   that they bring him to a lineup.  As a result of two lineups

2   he identifies Basciano.

3              THE COURT:  Do you have anything you want to say?

4              MR. ANDRES:  Yes.  First of all, I just asked her

5   whether or not she asked him if he knew Mr. Basciano.  She

6   said she didn't ask the question.

7              MR. LEVIN:  She might not have.  I don't know if she

8   asked the question or not.

9              MR. ANDRES:  That is relevant because if he knew

10  Basciano then the lineup can't be suggestive because he has an

11  independent basis from which to identify Mr. Basciano.

12             MR. LEVIN:  She's already testified.

13             MR. ANDRES:  Excuse me.

14             THE COURT:  This is all hearsay.  I'm trying to

15  figure out whether there's enough here to do anything more on

16  this point.

17             MR. ANDRES:  We're entitled to ask the question.

18  Mr. Nunez was interviewed five times before this.

19             MR. LEVIN:  Not by us.

20             MR. ANDRES:  But they are aware of that and Miss

21  Clemons, as an investigator, any investigator, certainly

22  somebody who has been trained for 25 years, knows that before

23  you go investigate somebody and interview them, you read the

24  prior statements.

25             THE COURT:  I didn't ask that.

1           MR. ANDRES:  I want to ask about all this things

2      that she did before she got there.

3           THE COURT:  You ask and we'll find out what it is.

4           (Open court.).

5           THE COURT:  All right.

6      BY MR. ANDRES:

7      Q    Miss Clemons, can I just ask you again, actually for the

8      first time, excuse me, can you identify for the court the time

9      line that Mr. Nunez told you from the time he got shot, what

10     happened until the time he got to the lineup?

11     A    Yes.

12     Q    Okay.

13     A    He was shot in the morning, he said.  He went to the

14     hospital, he said.  I believe he said he arrived there

15     sometime in the morning, between ten and eleven.  He was

16     interviewed by police detectives or perhaps from Police,

17     someone with the Organized Crime Task Force from the Bronx

18     DA's office, the Bronx DA's office.

19     Q    At the hospital?

20     A    At the hospital.

21     Q    Okay.

22     A    He was released from the hospital, from the emergency

23     room after a rather short period of time, an hour, perhaps two

24     hours, and went home to his home in the Bronx.

25           At some point while he was home, that afternoon or

Clemons  - cross/Andres                     288

1    early evening, detectives, police detectives or Organized

2    Crime Task Force detectives from the DA's office in the Bronx

3    went to his home and interviewed him and he was shown

4    photographs, the photographs that I discussed before --

5    Q    Could you tell us again.  Explain the photographs, what

6    do you understand surveillance to be?

7    A    I only know what he said.

8    Q    Okay.

9    A    He said they were not clear like mug shots and head

10   shots, they were surveillance photographs.  He described them

11   as being somewhat blurry even.  But he viewed those

12   photographs with the names on the photograph, Vincent

13   Basciano's name on a photograph, and subsequent to that, I

14   believe even that night, or thereabouts, he attended two

15   lineups and identified Vincent Basciano from the photographs

16   he had seen in the second lineup where he said he was standing

17   somewhere in the middle of the lineup.

18   Q    Did you ask him whether anybody coerced him into

19   identifying Vincent Basciano?  That is a yes or no question.

20        Did you ask him whether or not anyone coerced him

21   into identifying Vincent Basciano?

22   A    I may have.  Vincent Basciano, no.

23   Q    You did not ask him whether somebody coerced him into

24   identifying Vincent Basciano?

25   A    I didn't, no.

Q    Did you ask him whether or not he knew Vincent Basciano
previously?

A    I did not ask that question, no.

Q    You were there on behalf of Anthony Donato.  Did you ask
him whether or not he knew Anthony Donato?

          MR. LEVIN:  Objection as to Anthony Donato.  He's
not the subject of this proceeding.

          MR. ANDRES:  If I can approach?

          THE COURT:  All right.

          (Sidebar.)

          MR. ANDRES:  Mr. Nunez also, correct me if I'm
wrong, also saw a lineup of Anthony Donato.

          THE COURT:  That is the first lineup?  There were
two lineups?

          MR. ANDRES:  There were several.  He did a lineup --

          MR. CHAN:  DeFilippo.

          MR. ANDRES:  The relevance of this is what was
Mr. Nunez' prior relationship with Basciano, Donato and
DeFilippo --

          MR. LEVIN:  She didn't know that.

          MR. ANDRES:  Since the shooting related to they had
a prior relationship, it wasn't a drive-by shooting, it
related to a gambling dispute.  So it's important to probe
what else she asked about, what happened there, whether she
asked about Donato, whether she asked about Patty DeFilippo,

Clemons  - cross/Andres                    290

1   because he didn't pick out a photograph of DeFilippo, and it

2   would be interesting to know if the cop showed photographs --

3   I should say relevant to know whether the cop showed him

4   photographs of DeFilippo and Donato since they were the other

5   individuals.

6           MR. LEVIN:  There was no lineup of Donato.  There

7   was no identifying procedure.

8           MR. ANDRES:  The point is, if those are the people

9   that were arrested there and there is this tampering, why

10  wouldn't they tamper with Donato.

11          THE COURT:  You can ask.

12          MR. LEVIN:  There is no claim of tampering.  There

13  has been no claim by the defense of tampering.  The claim here

14  is that by showing an individual photograph with the guy's

15  name on it, that is suggestive.

16          MR. ANDRES:  It is tampering.  No law enforcement

17  official would ever show photographs -- that is tampering.

18          MR. LEVIN:  If that's what your tampering is.  I was

19  thinking in a different light.

20          THE COURT:  All right.

21          (Open court.)

22          THE COURT:  Proceed.

23  BY MR. ANDRES:

24  Q    During the course of your interview with Mr. Nunez, did

25  you ask him whether or not he was ever shown a photograph of

Clemons  - cross/Andres                    291

1    Anthony Donato?

2    A    He said he was shown a photograph of Anthony Donato.

3    Q    What kind of photograph of Anthony Donato was he shown?

4    A    It was a surveillance photograph with Anthony Donato's

5    name written on the photograph.

6    Q    Was that the same photo or a different photograph than

7    the photograph with Vincent Basciano in it?

8    A    They were separate photographs.

9    Q    How about Patrick DeFilippo, did you ask him if he saw a

10   photograph of Patrick DeFilippo?

11   A    He said he was shown a photograph with Patrick

12   DeFilippo's name written on it.

13   Q    What kind of photograph was that?

14   A    He said it was a surveillance photograph.

15   Q    Are you aware -- do you know if he picked out Mr. Donato

16   in a lineup after that happened?

17   A    He said that he did not identify Anthony Donato from a

18   lineup.

19   Q    Do you know if he had actually known Anthony Donato

20   before?  Prior to the shooting did you ask him if he knew

21   Anthony Donato?

22   A    Yes, I did.

23   Q    What did he say?

24   A    He said that until -- I'm not sure what he said.  He said

25   yes, based on a photograph with Anthony Donato's name written

BHS     OCR     CM     CRR     CSR

1    on it.

2    Q    He said yes, he knew Anthony Donato?

3         MR. LEVIN:  That is a misstatement.

4         MR. ANDRES:  I'm asking her to clarify.  Excuse me.

5    Q    Can you repeat that.  Let me start over.  I'm not trying

6    to confuse you.

7         If you don't understand something I ask, please ask

8    me to restate it because obviously it's important that we be

9    accurate here.

10        With respect to Mr. Donato, did you ask Mr. Donato

11   whether he knew -- sorry -- did you ask Mr. Nunez whether he

12   knew Mr. Donato, yes or no?

13        THE COURT:  Prior to the shooting?  This is prior to

14   the shooting?

15        MR. ANDRES:  Yes.

16   A    Yes.

17   Q    And what did he say?

18   A    He said only based on the surveillance photograph with

19   Anthony Donato's name on it, yes.

20   Q    Okay.  You've been an investigator for 25 years; is that

21   correct?

22   A    Yes.

23   Q    Do you understand what that means?

24        MR. LEVIN:  Objection.

25        THE COURT:  Sustained.

Clemons  - cross/Andres                     293

1   Q     Did you ask a follow-up question?

2             MR. LEVIN:  Objection.

3             THE COURT:  Sustained.

4   Q     After you asked -- after he gave that answer, that

5   critical answer that he only knew Anthony Donato based on the

6   surveillance photograph that he was shown, did you ask a

7   follow-up question?

8   A     Yes.

9   Q     What follow-up question did you ask?

10  A     Various follow-up questions.

11  Q     What questions were asked and what answers were given?

12            MR. LEVIN:  Objection.

13            THE COURT:  Go ahead.

14  A     What Nunez said was that he knew the names Vincent

15  Basciano, Anthony Donato, and Patrick DeFilippo not

16  independently but as a result of the subsequent investigation

17  after his shooting.

18            He could not identify Anthony Donato, which

19  obviously led to a number of questions.  He recognized the

20  name and, of course, he knew that in part the questions that I

21  was asking him were on behalf of John Pollok, Anthony Donato's

22  attorney.

23            Independently, he had no recollection of Anthony

24  Donato; he could not identify him from the lineup even after

25  he saw the photograph.  So although, yes, he said he knew

BHS     OCR     CM     CRR     CSR

1   Anthony Donato, it was clear after speaking with him that he

2   really didn't know Anthony Donato.

3   Q    Clear to you?

4   A    Yes.

5   Q    So now we're talking about your understanding?

6   A    Yes, that's correct.

7   Q    I'm asking you about the specific questions you asked and

8   the specific answers he gave because the judge has ruled that

9   your understanding is not relevant here.  Let me try that

10  again.

11  A    Yes, that's based on what he told me.

12  Q    What he had told you?

13  A    Yes.

14  Q    So since I'm not clear, you asked him if he knew Anthony

15  Donato?

16  A    Yes.

17  Q    And his answer was that he knew Anthony, the name Anthony

18  Donato, based on the investigation into his shooting?

19  A    He said yes, he knew Anthony Donato.  And in further

20  questioning him, he knew Anthony Donato based on the

21  subsequent investigation, and he knew that Donato was a

22  defendant in the subsequent charge for the shooting of Nunez.

23  Q    Did he also say that he knew the name Vincent Basciano

24  because of the subsequent investigation into Nunez?

25  A    Yes.

Q    Is that inconsistent with respect to what you testified
previously?

        MR. LEVIN:  Objection.

Q    Is that inconsistent with your prior testimony that
Mr. Nunez said he knew Mr. Basciano from the photograph?

        MR. LEVIN:  Objection.

        THE COURT:  Sustained.

Q    Didn't Mr. Nunez previously tell that you the reason he
knew Mr. Basciano was because of the photograph he was shown,
the surveillance photograph?

A    That's how he was able to identify him in the lineup,
based on that photograph with the name across the photograph,
written on the photograph.

Q    Do you know if in the lineup Mr. Basciano's name was in
the lineup?

A    He didn't say that.

Q    That wouldn't uncommon, would it?

        MR. LEVIN:  Objection as to what would be common.

        THE COURT:  Sustained.

Q    What about Patrick DeFilippo, what did he say about
Patrick DeFilippo?

        MR. LEVIN:  Objection as to relevance.  This is not
Mr. DeFilippo's hearing.

        THE COURT:  Overruled.

Q    What did he say, if anything, about Mr. DeFilippo?

1  A     He was shown a photograph of Patrick DeFilippo with his

2  name written across the photograph.  In the lineup he was told

3  that all of the defendants were in the two lineups -- the two

4  lineups, and he did not identify Patrick DeFilippo in the

5  lineups.

6  Q     So he's shown a photograph of Vinnie Basciano and he's

7  able to identify Basciano in the lineup.  Is that correct?

8  A     That's what he said, yes.

9  Q     And then he also is shown a photograph of Patrick

10 DeFilippo but he's not able to identify DeFilippo as being

11 involved in the attempted murder?

12 A     That's what he said.

13 Q     Do you know, what do you know about the underlying facts

14 of the Nunez murder --

15            MR. LEVIN:  Objection.

16 Q     Do you know who was arrested that day?

17            MR. LEVIN:  Objection.

18            THE COURT:  Sustained.

19            MR. ANDRES:  Can I approach?

20            THE COURT:  No.  Keep going.

21 Q     Prior to the time that you got -- that you interviewed

22 Mr. Nunez, did you do any of your own investigation into the

23 murder -- attempted murder of David Nunez?

24            MR. LEVIN:  Objection.  Relevancy.  Beyond the scope

25 of direct.

Clemons  - cross/Andres                              297

1          MR. ANDRES:  The relevance is what she knew when she

2    got there, whether or not she could ask intelligent questions

3    including who was arrested that day.

4          THE COURT:  I will allow it.  Go ahead.

5    Q    What, if anything, did you do?

6    A    Either before that time or just after that time, I filed

7    a FOIA request with the NYPD for whatever portions of the file

8    to be turned over to me.  And I also requested, and I'm not

9    sure if it was before or after that interview, but it was

10   about then, the file which was archived in the Bronx.

11   Q    So just so we're clear.  Your testimony is that you made

12   an independent request for that file?

13   A    Before or after that interview, ah uh.

14   Q    From the Bronx DA's office?

15   A    From the Bronx DA's office, no.  The court file.

16   Q    Did you get a copy of that file from Thomas Lee?

17   A    No.

18   Q    Never?

19   A    Never.

20   Q    Did you ever talk to Thomas Lee about that?

21   A    No.

22   Q    Did you ever get a copy of that file from Mr. Levin?

23   A    No.

24   Q    How about from Mr. Basciano?

25          MR. LEVIN:  Objection, don't answer.  Privileged.

Clemons  - cross/Andres                      298

1  She works for the defendant.

2          THE COURT:  Sustained.

3          MR. ANDRES:  Judge, it's not a privileged matter as

4  to what documents she is testifying about here.

5          THE COURT:  Anything Mr. Basciano gave her I'm not

6  going to let her testify about.  You can ask a more general

7  question.

8  Q    So you didn't get that document -- any of those filings

9  from anybody else besides -- the only place those files came

10 from was from your own request?

11 A    Yes, that's correct.

12 Q    Do you know Tommy Lee?

13 A    I've met him, yes.

14 Q    Have you ever worked with him?

15         MR. LEVIN:  Objection as to ever worked with him.

16 It's not related to this matter.

17         MR. ANDRES:  That is the possible source of some of

18 this information.

19         MR. LEVIN:  A possible source?

20         THE COURT:  You asked about the file.  You want to

21 ask another question about Mr. Lee.

22 Q    Have you ever been to co-defendant meetings at the MDC?

23         MR. LEVIN:  In regard to what matter?

24 Q    In this case.

25         MR. ANDRES:  If you have an objection --

Clemons  - cross/Andres                              299

1              THE COURT:  No.  It's my job.

2   A    No.

3   Q    Well, you've never been to a co-defendant meeting?

4   A    No.

5   Q    You've never been to a co-defendant meeting in this case?

6   A    No.

7   Q    Do you know your name appears on the request to attend a

8   co-defendant meeting on regular basis?

9   A    That could be.

10  Q    You don't ask to go?

11             THE COURT:  She said she hasn't gone.  Let's not

12  talk about why she didn't go.

13  Q    You testified that -- what did you review in the FOIA

14  file?

15  A    It was never turned over.

16  Q    Are you aware of the fact that Vincent Basciano plead

17  guilty to gun possession on the very day that the Nunez

18  shooting occurred?

19             MR. LEVIN:  Objection.  Misstates the evidence.

20  There has been no evidence as to that.

21             THE COURT:  No.  Since I don't know, I'm going to

22  let her answer the question.

23  A    What I understood was that there were three defendants

24  charged in that case, arrested that day, Vincent Basciano,

25  Anthony Donato, and Patrick DeFilippo.

Clemons  - cross/Andres                    300

1    Q    Do you know what the results of that criminal case was?

2              MR. LEVIN:  Objection.

3              THE COURT:  You may answer.

4    A    I believe that there were pleas in that case.  I don't

5    specifically know what the pleas were for.

6              MR. ANDRES:  Judge, may I approach?  I want to mark

7    this as Government Exhibit AA.

8    Q    I am handing you what has been marked as Government

9    Exhibit AA.  Have you ever seen that document before?

10             It is a copy of Mr. Basciano's guilty plea for the

11   crimes related to that day.

12   A    What is this, is this a plea?

13   Q    Mr. Basciano and Mr. DeFilippo and Mr. Donato's guilty

14   plea relating to their arrest on the same day that Nunez was

15   shot.

16             MR. LEVIN:  Objection.  It misstates the document.

17             THE COURT:  I don't have the document here.

18             MR. LEVIN:  I'll be happy to provide with you my

19   copy.  That is a complete misstatement of the facts and that's

20   not true.  The shooting was in '85, the plea was in '87.  He

21   keeps saying the same day.

22             MR. ANDRES:  Judge, the guilty plea was for the

23   crime that they were arrested on, on the day that Nunez was

24   shot, which is what it is.

25             THE COURT:  No.  What you said was he pled guilty on

1    the same day.  You misspoke, but I understand that he could

2    not have pled guilty on the same day.  So let's move on.  He

3    plead guilty at a later date.

4    Q    Have you seen this document before?

5    A    I believe so.

6    Q    Are you aware of the fact that Mr. Basciano was arrested

7    on the day, the same day that Mr. Nunez was shot?

8    A    Yes, I understand.

9    Q    Are you aware that he was arrested in close proximity to

10   the location where Nunez was shot?

11   A    In the Bronx, I believe.

12   Q    Okay.  Are you aware of the fact that on that day

13   Mr. Basciano was arrested with a gun, or that he had -- that

14   he was arrested with a gun on that day?

15   A    I'm not sure about that.  I don't know.

16   Q    Are you aware of the fact that that gun matched the

17   ballistics or that that gun was of the same type as the

18   ballistics of the bullets that were taken from Nunez' body?

19   A    I don't know.

20            MR. LEVIN:  I object to this.  This is trial

21   testimony of a witness that is not qualified to respond to

22   these questions.  Her job was, she ordered the file, she only

23   knows what she read in the file, which is relevant to the Wade

24   hearing, and what Mr. Nunez told this investigator in regard

25   to the identification procedure.

1           We're not here to litigate whether Mr. Basciano pled

2     guilty and what the evidence is in the gun possession case.

3           THE COURT:  What is relevant is what her prior

4     knowledge was regarding the circumstances about which she was

5     interviewing Mr. Nunez.  So to that limited extent it's

6     relevant.  But I don't know why we're going into such detail

7     here, Mr. Andres.

8           MR. ANDRES:  Thank you, Judge.

9     Q   Are you aware of the fact that Mr. Nunez was previously

10    interviewed with respect to the -- Mr. Basciano's

11    participation in his murder -- in his attempted murder?

12    A   He said that he had been previously interviewed.  It may

13    have been that year, it may have been even some months before

14    my interview of him.  But he said the focus was on something

15    else that --

16    Q   Who did he say he was interviewed by?

17    A   I believe he said the FBI.

18    Q   Do you know who Gary Friedman is?

19    A   No.

20    Q   Never heard of a defense lawyer named Gary Friedman?

21          MR. LEVIN:  Objection to this, your Honor.

22    A   I'm talking 2005.

23          THE COURT:  Sustained..

24          MR. ANDRES:  Judge, there is -- one question about

25    Mr. Friedman is relevant and I can proffer to the court why it

Clemons  - cross/Andres                    303

1    is.

2              THE COURT:  All right.  Go ahead.  One question.

3    Q    Have you ever known a lawyer named Gary Friedman?

4    A    Yes, I know that name.

5    Q    Have you ever worked with him?

6    A    Never.

7    Q    Do you know if he's currently in jail?

8    A    If it's same person I'm thinking of, he's in jail.

9    Q    Do you know why he's in jail?

10   A    I believe it's a racketeering charge.

11   Q    Are you aware of the fact that he interviewed Mr. Nunez?

12   A    No, I don't know anything about that.

13   Q    During the course of your involvement in the defense of

14   Mr. Basciano, have you reviewed -- without saying what you've

15   done -- have you reviewed the discovery materials in the case?

16   A    A limited amount.

17   Q    Okay.  Let me show you Government Exhibit BB.

18             THE COURT:  Attachment A was the, apparently was

19   that the plea before Justice Fried?

20             MR. ANDRES:  Yes.

21             THE COURT:  That was in 1987?

22             MR. ANDRES:  Correct.

23             THE COURT:  You're not offering that in evidence?

24             MR. ANDRES:  I'm offering it in evidence, Judge.

25             MR. LEVIN:  Your Honor, we're not here to retry this

1    count.  This is a strictly limited issue as to the

2    suggestibility of the identification.  He's asking this

3    witness about events that took place 20 years before she was

4    involved in the investigation.

5             MR. ANDRES:  Judge, he asked that witness about

6    things that happened 20 years before.  Obviously it's

7    relevant.

8             THE COURT:  All right, BB, what is BB?

9             MR. ANDRES:  BB is the interview of David Nunez

10   taken by Gary Friedman in December 11, 1985.

11   Q    Ave you ever seen this before?

12   A    No.

13   Q    Could I ask you to review it?

14            THE COURT:  What part of it.

15            MR. LEVIN:  She said she never saw it before.

16            THE COURT:  What part of it?  She said she never saw

17   it.  What is the point?

18            MR. ANDRES:  Judge in this court, Mr. Nunez never

19   gives a consistent account of what --

20            THE COURT:  That is Mr. Nunez.  We're only concerned

21   here about what this witness learned from Mr. Nunez.  If you

22   have questions about -- the only reason to ask this witness

23   questions about her background on the case is how did it

24   inform her questioning of Mr. Nunez.

25            So if she had certain understandings of prior

Clemons  - cross/Andres                    305

1   proceedings and information, that would be useful to the

2   court.  But an expansive discussion of everything that

3   happened with Mr. Nunez is not really the purpose of this

4   hearing.

5   Q    Are you aware of the fact that in February, 2004,

6   Mr. Nunez gave an interview to the FBI and never mentioned

7   anything about surveillance photographs to the FBI agents?

8   A    I have no idea.

9   Q    Are you aware of the fact that in May of 1986 Mr. Nunez

10  was interviewed by the FBI and never said a single word about

11  being shown surveillance photographs?

12  A    I have no idea.

13  Q    Are you aware of the fact that there was a Wade hearing

14  conducted in state court in which Mr. Nunez never testified

15  about showing any surveillance photographs -- being shown any

16  photographs?

17  A    No.

18           MR. LEVIN:  Objection.  That misstates the prior

19  history of the case.  Mr. Nunez never testified in the Wade

20  hearing.

21           THE COURT:  I am aware of that.  Sustained.

22           MR. ANDRES:  I didn't say he did.

23           MR. LEVIN:  Yes you did.

24           THE COURT:  It presupposes that he did.

25  Q    Do you know who Michael Lareiro is?

Clemons  - cross/Andres                306

1   A    No.

2   Q    Do you know of any efforts on the part of anyone to

3   tamper with Mr. Nunez as a witness after the time that he was

4   shot?

5           MR. LEVIN:  Objection.

6   A    No.

7   Q    Do you know Alfred Bottone is?

8   A    A defendant?  An inmate?

9   Q    I'm asking you.

10          THE COURT:  Is that a question or an answer?  Do you

11  know?  Do you know Mr. Bottone?

12          THE WITNESS:  I know the name.

13          THE COURT:  Next.

14  A    How do you know the name?

15          MR. LEVIN:  Objection.  Beyond the scope of this

16  hearing, your Honor.

17          THE COURT:  I don't know that it is.  You'll have to

18  draw a connection for me.

19          MR. ANDRES:  I need to know if she knows him first.

20          THE COURT:  How do you know him?

21          THE WITNESS:  I don't know him.  I know his name.  I

22  believe he's an inmate in Otisville and I may have wanted to

23  speak to him about something completely nonrelating to the

24  David Nunez matter.

25  Q    What does it mean you may have wanted to?  You either did

Clemons  - cross/Andres                    307

1   or didn't, which is it?

2   A    Originally I did and --

3              MR. LEVIN:  Objection.

4              THE COURT:  She said --

5              MR. LEVIN:  I'm sorry.

6              MR. ANDRES:  Can she answer the question?

7              THE COURT:  I didn't hear the answer.  What was your

8   answer?

9              THE WITNESS:  I don't know the question.

10  Q    You testified that you may or may not may have wanted to

11  interview him, and I asked which was it?

12  A    It was both.

13  Q    Did you want to interview him or did you not want to

14  interview him?

15  A    Both.

16             THE COURT:  In connection with this matter?

17             MR. ANDRES:  Yes.

18             THE WITNESS:  Nunez?

19             THE COURT:  Yes.

20             THE WITNESS:  Not relating to this at all.

21             THE COURT:  Next.

22  Q    Prior to the time that you saw Mr. Nunez, did you contact

23  his lawyer?

24  A    His lawyer?

25  Q    Is there something about that question that you didn't

Clemons  - cross/Andres                    308

1    understand?

2          THE COURT:  Please, please.  Did you contact his

3    lawyer before you spoke to Mr. Nunez?

4          MR. LEVIN:  Objection.  Presupposes she knows he had

5    a lawyer.

6          MR. ANDRES:  She had to know he had a lawyer.  The

7    question is --

8    Q    You knew he was in jail, didn't you?

9    A    I knew he was in a jail.

10   Q    Based on your 25 years as a criminal investigator, is it

11   your understanding that criminal defendants, people who are in

12   jail, may have defense lawyers?

13   A    Up until the time they are convicted, I suppose that's

14   true, but he was not in a pending case, to my knowledge.

15   Q    My question is, did you contact his lawyer, yes or no?

16   A    To my knowledge he had no lawyer.

17   Q    My question is this:  Did you or did you not contact his

18   lawyer?

19         MR. LEVIN:  Objection.

20         THE COURT:  She's answered the question.

21   A    There was no lawyer to contact, to my knowledge.

22         THE COURT:  All right.  Stop.

23         MR. LEVIN:  He's badgering the witness.

24         THE COURT:  Stop.  Do you have something else?

25   Q    During the course of the time that you interviewed

Clemons  - cross/Andres                    309

1    Mr. Nunez, did you take any notes?

2              MR. LEVIN:  Objection.  Work product and privileged

3    information.  No different than what we just went through with

4    Mr. McDonald.

5              MR. ANDRES:  Actually it is.  Mr. McDonald answered

6    the question whether he had notes and asserted a privilege.

7    I'm asking if she has notes.

8              MR. LEVIN:  You can ask if he took notes.

9              MR. ANDRES:  I would appreciate if the court ruled

10   on the evidentiary questions.

11             MR. LEVIN:  Sorry, your Honor.  I withdraw that

12   comment.

13             THE COURT:  Did you take notes?

14             THE WITNESS:  Yes.

15             THE COURT:  Next.

16   Q    With respect to your work as a criminal investigator for

17   Mr. Basciano, are you being paid?

18             MR. LEVIN:  Objection.

19             THE COURT:  Sustained.

20             MR. ANDRES:  Judge, that's clearly relevant.

21             MR. LEVIN:  How?

22             MR. ANDRES:  Can we approach?

23             THE COURT:  Sustained.

24             MR. ANDRES:  Can I have one moment?

25             THE COURT:  Certainly.

Clemons  - cross/Andres                310

1          (Pause.)

2          MR. ANDRES:  Can I approach?

3          THE COURT:  It's 1:15.  How much do you want to

4    approach?

5          MR. ANDRES:  For five minutes.

6          THE COURT:  Are you going to have more for this

7    witness?

8          MR. ANDRES:  Not really.

9          THE COURT:  Are you going to have anything more for

10   the witness.

11         MR. LEVIN:  I have one question.

12         MR. ANDRES:  Mine is based on a sidebar.

13         THE COURT:  All right.

14         (Sidebar.)

15         THE COURT:  Yes.

16         MR. ANDRES:  If Miss Clemons has testified about her

17   notes then we are entitled to them.  It is not remotely

18   relevant to the question with respect to Mr. Massino because

19   we're not Mr. Massino's lawyers; Mr. McDonald is and he is the

20   one that asserted the work product issue.

21         Miss Clemons is testifying specifically about

22   something that she did for the defense and she has clearly --

23   the defense has told her -- waived any confidentiality with

24   respect to those notes and so if there are prior inconsistent

25   statements or prior statements at all, we're entitled to them.

1           MR. LEVIN:  It's just you make up the law as you go

2     along.

3           MR. ANDRES:  Can we not have the comments.

4           MR. LEVIN:  This is no different than the

5     government's notes or 3500 material.  If we had a statement of

6     Miss Clemons we would turn it over.

7           All Miss Clemons has is what Nunez told her, which

8     is Nunez' 3500 material, which would be turned over to the

9     government in the event Nunez were called to testify.

10           It is the exact same issue as when the government

11     puts an FBI agent on the stand and says, I only know what the

12     witness told me, but I have no substantive thing to say, and

13     second of all, it is not --

14           MR. ANDRES:  The agents didn't testify about the

15     stuff that Mr. Massino said, that was part of the problem.

16     Nothing in that hearing was about the substance of -- Judge,

17     let me make this easy for you.  I will reserve on this issue

18     because I don't think this is relevant to the Wade hearing at

19     the end of the day; that is to say this witness' testimony is

20     remotely relevant.

21           THE COURT:  You can argue that later.  We're done.

22           MR. ANDRES:  I will reserve on that issue with the

23     possibility that we will recall Miss Clemons as a witness to

24     turn over her notes.

25           MR. LEVIN:  They rested.

Clemons  - redirect/Levin                 312

1          THE COURT:  When did they rest?

2          MR. LEVIN:  The whole reason I called Miss

3   Clemons --

4          MR. ANDRES:  I'm asking for permission to reopen the

5   cross-examination if and when it becomes necessary that

6   we're --

7          THE COURT:  No.  I will take that up if it becomes

8   necessary.

9          (Open court.)

10  BY MR. ANDRES:

11  Q    Miss Clemons, thank you very much.  I have no further

12  questions.

13         MR. LEVIN:  I have one or two follow-up.

14  REDIRECT EXAMINATION

15  BY MR. LEVIN:

16  Q    You stated that part of your function was to obtain the

17  files from the Bronx DA's -- Bronx Courthouse; is that

18  correct?

19  A    Correct.

20  Q    And you visited Mr. Nunez in jail; correct?

21  A    Yes.

22         (Continued next page.)

23         (Pages 313 through 316 sealed.)

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Clemons  - redirect/Levin                    315

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Clemons  - redirect/Levin                       316

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

317

1          (Open court.)

2          THE COURT:  Anything else, Mr. Levin?

3          MR. LEVIN:  No, your Honor.

4          THE COURT:  Anything else, Mr. Andres?

5          MR. ANDRES:  Judge, just as a rebuttal matter.

6          THE COURT:  No, as to this witness?

7          MR. ANDRES:  No.

8          THE COURT:  The witness is excused.  You may stand

9    down, ma'am.

10          (Witness excused.)

11          THE COURT:  Anything else, Mr. Levin?

12          MR. LEVIN:  Just to sum up on the Wade hearing.  I

13   have no other witnesses.  This was my case.

14          THE COURT:  All right.  Mr. Andres, do you have any

15   rebuttal?

16          MR. ANDRES:  I do, Judge.  I'm happy to call a

17   witness if you want me to.  I think it's waste of time.

18          THE COURT:  I'm not going to do it now.  Make an

19   offer of proof.

20          MR. ANDRES:  I would like to admit, to the extent

21   it's not admitted already, Mr. Basciano's guilty plea with

22   respect to the crime on which he was arrested, on the David

23   Nunez shooting.

24          I'd like to admit two prior FBI 302s which detail

25   Mr. Nunez' statement, one in 1986 and one in 2004, because in

1    neither of those -- I'm not sure "neither" is right

2    grammatically -- but in neither of those statements did he say

3    any of the things that Miss Clemons said.

4         I'm not suggesting that Miss Clemons is lying

5    necessarily, but that Mr. Nunez' reliability with respect to

6    what happened that day, there have been multiple stories, so

7    these statements are inconsistent with that, and more

8    importantly --

9         MR. LEVIN:  I would like an opportunity to review

10   them.

11        MR. ANDRES:  Can I finish?

12        MR. LEVIN:  Yes.

13        MR. ANDRES:  More importantly, Judge, in a

14   deposition taken by the defense --

15        MR. LEVIN:  Not this defense.

16        MR. ANDRES:  In a deposition presented on behalf of

17   Mr. Basciano, taken on December 12, 1985, of the very same

18   David Nunez, he mentions nothing of this.

19        So beyond that, the government will prove at trial

20   that Mr. Nunez was tampered with previously in 1985 and that

21   since then there also been at least one attempt to tamper with

22   him.  So there are three inconsistent prior statements with

23   respect to --

24        THE COURT:  Inconsistent with the hearsay

25   statements?

319

1    MR. ANDRES:  Correct.  Moreover, Mr. Basciano was
2  arrested on that day for gun possession and, in addition to
3  that, while not admissible in this case but potentially
4  relevant to this hearing, on the recorded conversation that
5  Mr. Levin raised this morning, Mr. Basciano himself makes -- I
6  don't want to characterize it, but I'll tell you what he
7  says -- in case I have a problem with the 1985 shooting --
8  which clearly is the Nunez shooting.
9    THE COURT:  All right.  Take a look at it.  I'll see
10 you at 2:30.
11   MR. LEVIN:  Your Honor, could I sum up very quickly?
12 If they turn over to me --
13   THE COURT:  It's time for lunch.  See you at 2:30.
14   (Luncheon recess.)
15   A F T E R N O O N   S E S S I O N
16   (Open court.)
17   THE COURT:  Yes.  Let me hear from you all.  Who
18 would like to talk first?  Mr. Levin.
19   MR. LEVIN:  Thank you.  As to the Wade issue, which
20 we're here to discuss, first of all I have no objection, if
21 the government wants to put in the 302s, I have no objection.
22 If anything, I think it further substantiates my point that
23 Mr. Nunez has said many things at many different times, and
24 upon close review of these 302s, yes, they are not only
25 inconsistent with what he told Miss Clemons in May of this

320

1    year, but they are inconsistent with his prior deposition

2    testimony in '85; they are inconsistent with the DD-5s in

3    which the police officers took information.  So my whole point

4    is, his testimony is all over the place.

5            The sole issue for this court to decide this

6    afternoon is whether his identification of Mr. Basciano in a

7    lineup was suggestive, unduly suggestive as that term has been

8    interpreted by the Supreme Court of the United States in all

9    the cases thereafter.

10           It is my position on behalf of Mr. Basciano that

11   when the police officers showed Mr. Nunez a surveillance

12   photograph of not only Mr. Basciano but of Mr. Donato, which

13   came out at the hearing, and that Mr. Basciano's name appeared

14   on the bottom of that photograph, that -- and there is no

15   evidence of a prior relationship between the parties, so there

16   can be no argument of confirmatory ID here.

17           Let's make that very clear.  When he identifies

18   Mr. Basciano subsequently the next day at a lineup one day

19   later, that he's identifying Mr. Basciano from the picture and

20   from his name underneath the picture, and that to me is

21   suggestive.  The only way we can cure that issue is to have an

22   independent source hearing, and to have an independent source

23   hearing, your Honor, you have to put Nunez on the stand.

24   That's the only way.

25           Alternatively, the government have not met their

321

1  burden of proving that it was not suggestive.  There is no

2  evidence whatsoever before this court that proves what he told

3  Miss Clemons in May of '05 is not truthful.  If the court has

4  inconsistent testimony the only way to resolve it is to hear

5  from Mr. Nunez.  That would be an independent source hearing.

6  That's what I have to say on this issue.

7        MR. ANDRES:  Judge, what's difficult and troubling

8  is that Mr. Levin's argument today is not even consistent with

9  the purposes of this hearing, that is to say, that your Honor

10 ordered a Wade hearing based on the defendant's application of

11 the following -- and I'm referring to page 36 of the defense

12 pretrial brief.

13        On information and belief, David Nunez will testify

14 that he identified Mr. Basciano in a lineup in connection with

15 a shooting, blah, blah, blah, however, the government's own

16 discovery supports a finding that Nunez' lineup identification

17 was mistaken and the result of suggestive procedures and his

18 in-court identification, if any --

19        THE COURT:  Slowly.

20        MR. ANDRES:  -- if any, would not be independently

21 reliable.

22        The defense is relying on the deposition that

23 Mr. Nunez took.  It's our position that after being threatened

24 by the defendant, or the notion that there was some tampering,

25 they didn't -- this notion that Miss Clemons interviewed

322

1   Nunez, they didn't file a submission on that.  They didn't

2   mention that anywhere in their pretrial brief and they didn't

3   even raise the issue of him being shown a surveillance

4   photograph.

5           The purposes of this hearing were because there's a

6   deposition which we turned over as Brady material and in that

7   deposition Nunez doesn't say anything about the surveillance

8   photographs.

9           So, yes, he's saying things that are inconsistent.

10  The defense is not even providing a consistent theory, but

11  none of it makes any sense.  It's all consistent with the

12  notion that Mr. Nunez was tampered with, which is what we will

13  prove at trial.

14          By the way, how does it possibly make any sense that

15  Nunez, because the cops were trying to suggest something to

16  Nunez, how does it make any sense that they showed him a

17  picture of Donato and they don't do a lineup of Donato; they

18  show him a picture of DeFilippo and he couldn't pick DeFilippo

19  out?

20          In other words, the cops are trying to be so

21  suggestive that the three individuals that they picked up with

22  guns a mile and a half or two miles from where the shooting

23  took place, that they are so out to get these people that they

24  use these procedures that are suggestive, which somehow only

25  leads to the identification miraculously of Mr. Basciano.

1          THE COURT:  Remind me, the amount of time between

2     the shooting and the lineup, how long?

3          MR. LEVIN:  Twenty-four hours, your Honor.

4          MR. CHAN:  That's about right.  There were lineups

5     done the same day of the shooting at the precinct that did not

6     involve the defendant -- sorry -- that did not involve

7     Mr. Basciano, it did involve Mr. Donato, but the following day

8     was the lineup of Mr. Basciano and Mr. DeFilippo by Nunez,

9     because he was recovering in the hospital.

10         What is also interesting is the records will be

11    provided to show that Mr. Nunez was escorted by the police

12    from the hospital to the DA's office for the ID.  He never was

13    released to go home, which was the story that Miss Clemons

14    said that Nunez said when she interviewed him.

15         So the record shows that he was guarded the entire

16    time he was in the hospital by detectives, escorted from the

17    hospital to the DA's office for that lineup.  So there is just

18    no inconsistency with Mr. Nunez' most recent story.

19         MR. LEVIN:  There are other inconsistencies, your

20    Honor.  If Mr. Nunez was under police observation from the

21    time he's at the hospital to the time he gets to the precinct,

22    then the FBI 302s would be incorrect because, when your Honor

23    gets to study the FBI 302s, Mr. Nunez states that he was able

24    to get the money and his shotgun to the person he worked for

25    before they took him to the precinct.  It's in the 302, your

324

1    Honor.

2          The point being -- and I really don't want to find

3    myself arguing all over the map -- this is a Wade hearing.

4    The issue for your Honor is the suggestibility and the

5    credibility of the witness we have not heard from.  If your

6    Honor is not sure how to handle this because he has not heard

7    from the witness, he has not heard from Nunez, the People

8    didn't want to put him on, then they haven't met their burden,

9    Judge, because we need an independent source hearing to

10   determine if Mr. Nunez can identify Mr. Basciano.

11         THE COURT:  What about that, Mr. Andres?

12         MR. ANDRES:  It's all new.  These aren't any legal

13   arguments that Mr. Levin has ever made before.  He certainly

14   has never briefed it.

15         THE COURT:  What about the significance of the

16   argument?  I don't care if he didn't think of it until last

17   week -- I'm wondering whether we need Mr. Nunez here.

18         MR. ANDRES:  I don't think that there's any question

19   that Mr. Nunez' is statements have been all over the map.

20   That is the point.  Them saying that Nunez provided yet

21   another inconsistent statement means that those statements,

22   which is their evidence of the suggestibility or the

23   unreliability of the lineup, that it's not a valid argument.

24         When you look at the lineup, that is the question,

25   and that's why, when your Honor asked for a copy of the

325

1   photograph, what is clear from the photograph is that there

2   are people in the photograph are largely -- they do look

3   similar.

4          So there's nothing about the photograph that is

5   inconsistent or that would prove that it was inconsistent.

6   Moreover, you have the testimony of the police officers and

7   the transcripts which we previously supplied to the court,

8   that the ADA, now 20 years later, doesn't remember the

9   particulars of that.  Obviously, we can't put him on as a

10  witness, but there are prior proceedings.

11         I think the evidence that is suggestive is what is

12  all over the map and that if Mr. Nunez testified he would

13  likely lie.  We have evidence that he has been tampered with

14  and if someone involved -- hypothetically, if somebody

15  involved in organized crime, if their investigator or defense

16  lawyer came to speak to me --

17         THE COURT:  Why do you think he would lie?

18         MR. ANDRES:  Because he's given inconsistent

19  statements from day one.  We're going to establish evidence at

20  the trial that he was tampered with, which provided the

21  motive --

22         THE COURT:  Tampered meaning that he was gotten to,

23  he was threatened, he was --

24         MR. ANDRES:  He was gotten to by the defense.  I'm

25  not suggesting Mr. Levin, I'm not even suggesting Mr. Savitt,

326

1    what I'm suggesting --

2              MR. SAVITT:  Thank God, Judge.

3              MR. CHAN:  The bottom line is that there are three

4    bases put forward by the defense as to whether or not the

5    lineup was suggestive.  The first two have to deal with the

6    photo, the ethnicity of the participants and the disheveled

7    look of Mr. Basciano.  So the court can decide that by looking

8    at the photograph whether or not that is true or not.

9              THE COURT:  Go ahead.

10             MR. CHAN:  The third and last basis is supposedly

11   Mr. Nunez was shown surveillance photographs of Mr. Basciano

12   before the lineup, which, if true, arguably could be

13   suggestive, but I don't think there's any reason to call

14   Mr. Nunez because, assuming we subpoena him and he testifies

15   exactly as to what Miss Clemons said that he said back then,

16   we would be back in the same position as we are today, which

17   was that we can't do anything about that, all we can do to

18   argue to the court is that what he would say on the stand

19   should not be credited.

20             We have all of that evidence before the court today.

21   You can look at his prior statements whether or not that story

22   internally a makes any sense, and because it doesn't, that

23   basis is gone.

24             MR. ANDRES:  This hearing is also a ruse on behalf

25   of the defense to figure out whether or not Mr. Nunez is going

327

1  to testify; that's what they want to know, whether or not

2  Mr. Nunez is going to be a witness at the trial and now,

3  through the course of this hearing, they will try to figure

4  that out because they don't even provide a consistent basis

5  for their application.

6        THE COURT:  You already said that.

7        MR. LEVIN:  Your Honor, I actually agree with Mr.

8  Chan's comments.  He's speaking exactly how the law would read

9  on this issue.  The difference is the remedy, Judge, the

10  remedy.

11        If they are not going to call Nunez, then we don't

12  need the hearing, and it isn't a ruse because then I have no

13  remedy to ask for.  The remedy the law entitles me to, if your

14  Honor were to find -- it's very simple, the remedy entitles me

15  to find that he cannot identify my client in court.

16        THE COURT:  I understand that.

17        MR. LEVIN:  That's all this is about.

18        THE COURT:  You know when I learned that --

19        MR. LEVIN:  In law school.

20        THE COURT:  I didn't have to go to baby judge

21  school, I didn't have to listen to you or Mr. Andres lecture

22  me on the subject.  It all happened in Criminal Procedure with

23  Professor Uviller, rest his soul.

24        MR. LEVIN:  I'm sorry, I don't mean to be demeaning

25  or anything, but I myself get confused --

328

1          MR. ANDRES:  If that is what is troubling here, I

2     assume there is some demeaning comment coming here.

3          MR. LEVIN:  There isn't.  The issue is very narrow.

4     Your Honor does have everything in that sense, but if your

5     Honor is not sure whether he can believe Mr. Nunez, I ask that

6     he be produced.  That's all.

7          THE COURT:  Is there anything else for today?

8          MR. LEVIN:  No, your Honor.

9          THE COURT:  All right.

10          MR. LEVIN:  Friday Mr. Savitt is going to cover for

11     me on the Miss Stafford issue, if that's all right with the

12     court.

13          MR. ANDRES:  I thought that was adjourned, the

14     status conference.

15          MR. LEVIN:  Your Honor asked that Mr. Savitt and

16     Mr. Seigel appear before your Honor to make a decision about

17     Miss Stafford.  I'm asking if I can be excused from that as

18     well as my client.  I would like to go see my family.  I have

19     been here for five days.

20          THE COURT:  That's fine.  If your client wishes to

21     be excused --

22          Basciano: :  If the judge doesn't mind.

23          THE COURT:  That I don't mind.

24          MR. LEVIN:  The next issue is Monday we resume the

25     jury selection process?  Am I getting the questionnaires

329

1    before Monday or am I getting them on Monday?  We have to

2    check with the clerk?

3           MR. ANDRES:  Mr. Levin and I speak every night and I

4    have certainly --

5           MR. LEVIN:  Not every night.

6           THE COURT:  There are 491 completed questionnaires,

7    a lot more than we anticipated.  The names on the jury list

8    are living people who have driver's licenses and vote and

9    whatever, and 491 out of 500 people showed up, which is a lot

10   higher percentage than we had for the Massino jury.

11          So it's taking some time to reproduce them and then

12   they will be given to the government.  Stay in touch with each

13   other and then you'll know.

14          MR. LEVIN:  Do we come back Monday?

15          THE COURT:  You're not coming here.  You're going to

16   submit to me by, I think it's February 2nd --

17          MR. CHAN:  Two Mondays from now.

18          THE COURT:  Then it's February 6th.  Then we

19   begin --

20          MR. ANDRES:  It's before that.  It's February 2nd.

21          THE COURT:  February 2nd.

22          MR. LEVIN:  Fine.

23          MR. ANDRES:  We're going to jointly agree, and

24   February 6th, which is a Monday we're all going to come back.

25          THE COURT:  Right.

330

1          MR. ANDRES:  We don't have to come to court before

2     then I don't think.  Is there any reason to?

3          THE COURT:  Hopefully not, unless there is some

4     other exigency.

5          MR. LEVIN:  I'm awaiting your Honor's ruling on the

6     Wade.

7          THE COURT:  Otherwise we're all set.  All right.  Is

8     there anything further for today?

9          Basciano: :  Can I have one moment to talk to my

10    lawyer?

11         (Pause.)

12         THE COURT:  I do have something else.

13         MR. LEVIN:  I have nothing further.

14         THE COURT:  There is a request by the press for a

15    copy of the sidebar discussing Mr. Nunez' status.

16         MR. ANDRES:  I would ask that that be sealed.

17         MR. LEVIN:  I have no opinion one way or another.

18         MR. ANDRES:  I'm not entirely sure that I have the

19    authority to seal that because we need permission of the

20    Attorney General, but I think your Honor sua sponte can.  It's

21    highly prejudicial.

22         The fact that a question was asked to the witness,

23    there was an objection and it shouldn't have been answered.

24    It wasn't answered, so --

25         MR. LEVIN:  To the extent that there is an issue

331

1   here for the future, under 609 it's going to come in any way.

2           MR. ANDRES:  How would that possibly come in?

3           MR. LEVIN:  A prior felony conviction.  The statute

4   says its admissible --

5           MR. ANDRES:  Subject to 403.

6           MR. LEVIN:  We can have that debate at another time.

7           THE COURT:  As you will tell me ad nauseam for the

8   next week or so.

9           MR. LEVIN:  I will.

10          THE COURT:  Don't put a big moat between you and 403

11  here.

12          MR. LEVIN:  The defense arsenal is very limited in

13  today's climate.  403 is a big issue.

14          MR. ANDRES:  A subsequent conviction of that nature

15  is obviously not remotely relevant.  He is a victim of a

16  shooting.  He's not on trial and so --

17          MR. LEVIN:  We'll be litigating that down the road.

18  I have nothing further.

19          THE COURT:  I'm sealing the sidebar subject to

20  reconsideration later on.  I find it extremely prejudicial to

21  make that available and it could potentially taint the jury

22  pool.

23          MR. ANDRES:  Moreover, I think the press knows

24  already.

25          THE COURT:  I didn't ask them.  They are asking the

332

1    court reporter to make it available and I'm sealing it in the

2    interests of justice.  I don't think there's any problem with

3    that.  If there is, we'll hear about it.

4          MR. ANDRES:  We asked Mr. Recoppa to investigate for

5    us the possibility of getting some sort of conference room,

6    because as far as I know we don't -- the U.S. Attorney's

7    office doesn't have any space in the new courthouse.

8          THE COURT:  How much conference room do you need?

9          MR. ANDRES:  The only thing that I was going to

10   suggest is that the room out here --

11         THE COURT:  There's a little room over there.

12         MR. ANDRES:  The only thing is, it would be nice if

13   we could put our witnesses in there.  We can't have our

14   witnesses and the evidence in the same place.

15         THE COURT:  While your case is going on you can put

16   your witnesses in there.  You can have your conferences in

17   there.  If there's a defense case, they will put their

18   witnesses in there.

19         MR. ANDRES:  If they also wanted space --

20         THE COURT:  Let me make it clear for the record.

21   There is one room right outside these swinging doors in the

22   back of the room which has a windowed door, and if you wish to

23   put your witnesses in there while they await testifying,

24   that's fine.

25         There's another room, which has two doors, one is on

333

1    the secure hallway and one is on the public hallway, which is

2    also available to be used in connection with the trial.  So if

3    that serves the purpose of preparing materials for your case,

4    that is fine.  When the defense puts on its case, should they

5    put on a case, then they will have the opportunity to ask for

6    the same thing.

7               MR. ANDRES:  I was going to suggest, to the extent

8    that your Honor could, that Judge Bloom's courtroom is across

9    the hall.  It seems like they have a conference room as well.

10   Maybe we can ask to borrow that during the pendency of the

11   trial and that way the defense would have a room because there

12   will be so much material, lugging 3500 material back and

13   forth.

14              THE COURT:  You would have to ask Judge Bloom about

15   that.  If she's not using it for another purpose, I would

16   think that she might be willing to accommodate you all, but

17   you certainly have my permission to inquire with Judge Bloom

18   about using her facilities.

19              Since she doesn't try cases ordinarily, I assume

20   that her courtroom is going to be used mainly for discovery

21   and status conferences.

22              Is there anything else for this afternoon.

23              MR. ANDRES:  Thank you, Judge.

24              MR. LEVIN:  Thank you.

25              THE COURT:  Come up, please.

334

1          (Sidebar.)

2          THE COURT:  I am advised --

3          Basciano: :  Could I come up too?

4          THE COURT:  You're entitled to be at a sidebar.

5          Basciano: :  Thank you.

6          THE COURT:  I'm advised by my law clerk that the

7    press actually doesn't want a copy of the sidebar.  Well, now

8    that they can't have it they don't want it, but they want to

9    be able to use the statement that Mr. Basciano made to the

10   press, which was not part of the proceedings.  I have no

11   control over that.  I mean it was said and I don't control it.

12         MR. LEVIN:  I don't know what the statement is.  Can

13   someone tell me what the statement is.  I was up here.

14         MR. ANDRES:  Why don't you ask your client.

15         MR. LEVIN:  I don't think I should be asking my

16   client that question in front of everybody.

17         THE COURT:  You can ask him --

18         MR. ANDRES:  What is the difference?

19         THE COURT:  He wants to ask his client.  Let him ask

20   his client.  I have no problem.  I just said what I said.

21         (Pause.)

22         MR. SAVITT:  It is privileged.

23         THE COURT:  What is privileged about a comment the

24   defendant is alleged to have made to a third party?

25         MR. SAVITT:  That is not privileged.  Our

BHS     OCR     CM     CRR     CSR

335

1    conversation now is privileged.

2           THE COURT:  Your conversation with each other, not

3    your conversation with me.

4           MR. SAVITT:  Absolutely.  I'm talking about the

5    conversation with each other.

6           THE COURT:  Now I have been advised by my other law

7    clerk that apparently what they want is to the substance of my

8    discussion about what Mr. Andres pointed out to me about what

9    Mr. Basciano is believed to have said to the press and my

10   comments about how I view this kind of activity.

11          MR. ANDRES:  And your history as a kindergarten

12   teacher.

13          THE COURT:  I'm not sure that would go far.  I

14   thought I sealed all of that, didn't I?

15          MR. LEVIN:  That you did seal.

16          THE COURT:  I really would like to clarify this

17   because it's really important going forward.  What is it that

18   they would really want?  This is Janet Hostetler.  Why don't

19   you tell this assembled group.

20          LAW CLERK:  My understanding is they would like the

21   prosecutor's comment about Mr. Basciano talking to the press,

22   that portion of the transcript.

23          THE COURT:  I think I sealed that proceeding.

24          MR. LEVIN:  You did.

25          THE COURT:  Thank you very much everybody.  ***

336

1

2 EDWARD  MC  DONALD                    1        207

3 CROSS-EXAMINATION                     1        207

4 MARGARET  CLEMONS                     1        275

5                                       1        275

6 DIRECT EXAMINATION                    1        275

7 CROSS-EXAMINATION                     1        279

8 REDIRECT EXAMINATION                  1        312

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25